HEALY & BAILLIE, LLP
Attorneys for Plaintiff
BOTTIGLIERI DI NAVIGAZIONE SPA
61 Broadway
New York, New York 10006
(212) 943-3980
Thomas H. Belknap, Jr. (TB-3188)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BOTTIGLIERI DI NAVIGAZIONE SPA

Plaintiff,

-against-

TRADELINE LLC,

Defendant.

Docket No.: 06 Civ. 3705 (LAK)

## PLAINTIFF BOTTIGLIERI DI NAVIGAZIONE SPA'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE ATTACHMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................... 1

FACTS ...................................................................................................... 4

      A.    The Parties and the Voyage ............................................. 4

      B.    The Underlying Disputes and The London Arbitrations ... 5

      C.    The Rule B Attachments in New York ............................ 7

ARGUMENT .......................................................................................... 10

POINT I ................................................................................................. 10
BDN HAS MET ITS BURDEN TO SHOW WHY THE ATTACHMENTS
SHOULD BE MAINTAINED ...................................................................... 10

POINT II ................................................................................................ 12
BDN'S CLAIM IS RIPE AND FULLY SUPPORTS A RULE B
ATTACHMENT ........................................................................................ 12

      A.    Plaintiff's Claims Are For Breach of Charter And Are
            Presently Ripe Under English Law ................................ 12

      B.    In Any Event, This Court Should Exercise Its
            Discretion To Allow Attachment In The Present Case ... 14

      C.    Plaintiff's Claim is Not Stale And, In Any Event, This
            Court Should Not Look Beyond Plaintiff's *Prima
            Facie* Case Because The Merits Are Subject To
            London Arbitration ....................................................... 18

POINT III ............................................................................................... 20
BDN PROVIDED ADEQUATE NOTICE OF ATTACHMENT
PURSUANT TO LOCAL RULE B.2 .......................................................... 20

POINT IV ....................................................................................... 23

MAINTAINING BDN'S ATTACHMENT IS EMINENTLY FAIR
UNDER THE CURCUMSTANCES ............................................. 23

    A.    Plaintiff's Proposed "Need" Test Should Not Be
        Followed ...................................................................... 23

    B.    In Any Event, Plaintiff's Need For Security Is Clear ...... 25

CONCLUSION ............................................................................. 30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allied Maritime, Inc. v. The Rice Corp.*, 2004 U.S. Dist. LEXIS 20353 (S.D.N.Y. 2004) ............................................................................ 25

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 384 F. Supp. 2d 726 (S.D.N.Y. 2005) ..........................................................................12, 25

*Blake Maritime, Inc. v. Petrom S.A.*, 2005 U.S. Dist. LEXIS 26310 (S.D.N.Y. 2005) ..........................................................................12, 24, 26, 29

*Central Hudson Gas & Electric Corp. v. Empressa Naviera Santa, SA*, 845 F. Supp. 150 (S.D.N.Y. 1994), aff'd, 56 F.3d 359 (2d Cir. 1995)( ................. 29

*Daeshin Shipping Co Ltd v. Meridian Bulk Carriers, Ltd.*, 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. 2005) .............................................................16, 17

*Eitzen Sealift A.S v. Cementos Andinos Dominicanos, SA*, 2005 U.S. Dist. LEXIS 19876 (S.D.N.Y. 2005) ........................................................ 16

*Greenwich Marine v. S.S. Alexandra*, 339 F.2d 901 (2d Cir. 1965) ...............15, 16, 17

*Jesselson v. Blech Family Trust*, 1997 U.S. Dist. LEXIS 8211 ........................... 12

*North of England Protecting and Indemnity Associate v. M/V NARA*, 1999 U.S. Dist. LEXIS 22375 (E.D. La. 1999) ..................................................20, 24

*Parkroad Corp. v. China Worldwide Shipping Co.*, 2005 U.S. Dist. LEXIS 11122 (S.D.N.Y. 2005) .......................................................... 24

*Seaplus Line Co. Ltd. v. Bulkhandling Handymax AS*, 409 F. Supp. 2d 316 (S.D.N.Y. 2005) ............................................................................ 25

*Staronset Shilling, Ltd. v. North Star Navigation Inc.*, 659 F. Supp. 189 (S.D.N.Y. 1987) ............................................................................ 15

*T&O Shipping, Ltd. v. Lydia Maritime Shipping Co. S.A.*, 415 F. Supp. 2d 310 (S.D.N.Y. 2006) ....................................................................... 16

*Thypin Steel Co. v. Certain Bills of Lading*, 1996 U.S. Dist. LEXIS 5909
(S.D.N.Y. 1996) .......................................................... 20

*Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002) ....................... 26

*Yayasan Sabah Dua Shipping Sdn Bhb v. Scandinavian Liquid Carriers
Ltd.*, 335 F. Supp. 2d 441 (S.D.N.Y. 2004) ..............................................26, 29

## PRELIMINARY STATEMENT

Plaintiff Bottiglieri Di Navigazione Spa ("BDN" or "plaintiff") submits this Memorandum of Law, as well as the accompanying Affidavit of Thomas H. Belknap, Jr. sworn to on July 31, 2006, the Declaration of Kathryn Whelan dated July 31, 2006 and the Declaration of Benjamin Rupert Olbourne dated July 31, 2006, in opposition to the motion by defendant Tradeline LLC ("Tradeline" or "defendant") to vacate the attachment by BDN of certain funds within this District pursuant to Rule B of the Supplemental Admiralty Rules to the Federal Rules of Civil Procedure.

Defendant's motion to vacate lacks merit and should be denied. In particular, defendant's contention that plaintiff's attachment is "premature" is baseless. Plaintiff's claims against defendant are for breach of a vessel charter contract. As can be seen, under English law (which governs the substantive claims between the parties) it is well established that even though a claim seeks recovery in respect of amounts for which the plaintiff might subsequently be found liable to a third party (here, the headowner of the vessel), it is nevertheless ripe for adjudication upon the occurrence of defendant's breach of charter which gives rise to the claim—and not, as defendant argues here, merely upon an actual incurrence of liability to the third party on the part of the plaintiff.

Even if the claim were merely one for indemnity, moreover, the law is well established that this Court has discretion to allow the attachment where plaintiff's ultimate liability to the claiming third party is reasonably apprehended. Here, the merits of the dispute between the headowner and plaintiff, and between plaintiff and defendant, are subject to English law and arbitration. The headowner has commenced arbitration

against plaintiff in London, and plaintiff has in turn commenced arbitration against defendant in London in accordance with the governing charter parties. All three parties have appointed arbitrators in the respective arbitrations. Plaintiff has proposed that defendant agree to arbitrate directly with headowner in view of the "back-to-back" nature of the contracts. Plaintiff has also requested that defendant voluntarily agree to provide security. Defendant has failed to agree to either request. Although the parties have refrained from exchanging Points of Claim in the arbitrations so that they can continue to engage in settlement discussions, the headowner has provided both plaintiff and defendant with a detailed breakdown of its claim, and plaintiff has fully put defendant on notice that it intends to make "back-to-back" submissions against defendant in respect of those claims. Under these circumstances, then, it is clear that plaintiff's apprehension of liability to headowner is sufficiently definite to justify upholding the attachment here.

Defendant's contention that plaintiff's claim is "stale" is without merit and, in any event, is not relevant to the present inquiry. As the evidence clearly indicates, defendant was put on notice of the claim in 2001 when it first arose, and it was provided with details about the headowner's claim as they became available to the plaintiff. Defendant contends that its ability to investigate the claim is now diminished by the subsequent passage of time, but of course it could have (and, indeed, may have) investigated the claim back in 2001. In any event, however, the merits of the claim are subject to London arbitration, and it is not for this Court to conduct an inquiry into the strengths or weaknesses of the parties' respective positions on the merits in conducting its inquiry here about whether the attachment should be vacated. At this juncture, the proper inquiry

is merely whether plaintiff has stated a "prima facie" case of breach of charter for which security should be permitted under Rule B.

Defendant's contention that plaintiff failed to give "prompt" notice of its attachment is frivolous. Contrary to defendant's suggestion, plaintiff gave notice of the attachment at the Bank of New York within three days of having learned about it from the bank. Under the circumstances of this case—*i.e.*, (1) where defendant waited until July 12, 2006 to make an application to vacate BDN's attachment notwithstanding that it admittedly received notice of the attachment on May 25, 2006 and (2) where the subject funds attached by BDN were also attached by a third party (Essco Faith) in March 2006 but to date defendant has not applied to vacate Essco Faith attachment such that even if it is successful in the present motion the funds will nevertheless remain restrained— plaintiff can show no prejudice, and there can therefore be no dispute that plaintiff's notice was timely.

Finally, defendant's contention that plaintiff is unable to demonstrate a "need" for the security is without merit. In the first place, the authorities are split as to whether this is even a proper inquiry for this Court in view of the clear language of Rule B. In any event, the decisions are clear that a plaintiff easily satisfies the "need" requirement where the evidence demonstrates (as it does here) that (1) defendant's net revenues are dwarfed by plaintiff's claim; (2) there are other substantial claims presently pending against the defendant which likewise dwarf defendant's net revenues and assets, (3) there are competing creditors actively seeking to obtain security from the defendant, posing a substantial risk that plaintiff's ability to obtain security and to assert a priority of claim

vis-à-vis other creditors will be substantially prejudiced if its attachment is vacated; and (4) where the defendant is only a small, regional company with offices in the United Arab Emirates, a jurisdiction in which it is virtually impossible to compel enforcement of an arbitration award against an unwilling defendant or against its assets. In short, Tradeline does not even come close to stacking up to the defendants in the cases which have held that a plaintiff had no need for the security it sought, and defendant's motion should therefore be denied.

## FACTS

### A. The Parties and the Voyage

BDN and the owners of the M/V KAVO DELFINI entered into a charter party for the vessel on or about February 9, 2001 (the "Headcharter"). (Whelan Dec., ¶ 4 and Ex A). By sub-charterparty dated January 26, 2001, BDN, as disponent owner, sub-chartered the vessel to Tradeline (the "Subcharter"). (Whelan Dec., ¶ 5 and Ex B).

Pursuant to the Headcharter and the Subcharter, the vessel loaded a cargo of maize and soya bean meal in bulk at Gral Lagos and Parangua, Argentina in March 2001 for carriage to B.I. Khomeini, Iran and arrived at the discharge port on about 9th April 2001. The cargo receivers alleged on discharge that part of the maize cargo was outturned in damaged condition. After discharge had been completed, the cargo receivers consequently detained the vessel at the discharge port and only released her over 11 days later after they were provided with security by the headowner in the amount of US$2,750,000. (Whelan Dec., ¶ 6).

### B. The Underlying Disputes and The London Arbitrations

By letter dated October 25, 2001, the London solicitor acting for BDN, Kathryn Whelan, Esq. of Consult Marine Ltd., formally put Tradeline on notice that BDN was asserting claims against it for breach of charter under the charter party. In that correspondence, BDN notified Tradeline of its appointment of Mr. Patrick O'Donovan as arbitrator "in respect of any and all disputes arising out of the above charterparty." (Whelan Dec., ¶ 7 and Ex C).

By letter dated November 13, 2001, BDN responded to a request by Tradeline for clarification of BDN's claims, noting that headowners had asserted claims against BDN for demurrage and detention. In this same correspondence, BDN requested that, in light of the nature of the claims being asserted, Tradeline agree to participate in arbitration directly with headowner since the charters are "back to back" (*i.e.*, on identical terms) and also agree "to secure the claim in the meantime." (Whelan Dec., ¶ 8 and Ex D).

By letter dated February 26, 2003, BDN's solicitors received from headowner's London Solicitors, Messrs. Shaw & Croft, a letter setting forth headowner's claims for freight, demurrage, and detention allegedly resulting from BDN's breach of the Headcharter in respect of the voyage. (Whelan Dec., ¶ 9 and Ex E).

By letter to BDN's solicitors dated September 12, 2003, Messrs. Shaw & Croft referred to previous correspondence in respect of headowner's claim "dating back to February 2003" and gave further notice and detail of its claim against BDN resulting from alleged damage to the cargo of corn, which it stated "falls into three categories: (1) freight (2) demurrage and (3) detention or damages for breach of charterparty." In that

letter, Messrs. Shaw & Croft set forth in some detail the various heads of the headowner's claim and also the specific bases for headowner's claims of breach of charter by BDN. (Whelan Dec., ¶ 10 and Ex F). They also explained the steps taken by headowner to respond to the cargo receivers' claims:

> In order to mitigate their losses our clients were obliged to provide security in the sum of US$2,750,000 so as to obtain the release of their vessel. Thereafter our clients compromised the claim made against them for US$2,080,000 and took steps to mitigate their loss by selling the rejected cargo to other buyers for US$823,969.92. Owners now claim their net loss as a result of the rejection of the cargo, being the cost of the claim paid to receivers less the proceeds of the salvage sale or US$1,256,030.08.

Upon receiving headowner's further clarification of its claim as set forth in its September 12, 2003 letter, (Whelan Dec., Ex. F), on September 15, 2003 BDN's solicitor wrote to John Habergham, solicitor for Tradeline, forwarding a copy of Shaw & Croft's letter and advising that headowner's "claim includes damages for <u>breach of contract</u> of US$1,256,030.08 in respect of receivers claim, following their rejection of the cargo, less the proceeds of the salvage sale." (Emphasis added). (Whelan Dec. ¶ 14, Ex. G). She further wrote in that same letter as follows:

> The basis of the claim is that pre-shipment treatment of the cargo of maize made it susceptible for the development of mould, Iranian regulations did not permit the import of cargo originating from Argentina (where the vessel was ordered to load) and that the presence of mould was likely to cause the cargo to be rejected by the Iranian Authorities. These are all matters within the control of your clients and <u>when Points of Claim are served on our clients, we will serve back-to-back submissions on the sub-charterers</u> and maintain an application for the arbitrations to be consolidated. [Emphasis added.]

6

In addition to the correspondence specifically referenced above, there has been substantial additional correspondence among the parties concerning this dispute. Attached as Exhibit H to the Whelan Declaration is a listing of all correspondence and meetings involving headowner, BDN and Tradeline relating to this matter. As can be seen from this exhibit, there has been substantial activity in this matter from 2003 to 2006.

Indeed, on March 31, 2006, Messrs. Shaw & Croft sent a further letter to BDN, with copy to Tradeline's solicitors, noting that "[s]ince the date of [headowner's 12 September 2003—Ex. F] letter of claim both parties have investigated the cause of the cargo damage and there is now substantially more evidence on this topic available than there was at the time we wrote our earlier letter." Shaw & Croft then proceeded to set forth in substantial detail the bases of headowner's claim against BDN for demurrage, detention and breach of contract and also provided their comments on the defenses raised by Tradeline. (Whelan Dec., ¶ 16 and Ex. I).

C.     The Rule B Attachments in New York

BDN commenced the instant action on May 15, 2006 by filing a verified complaint. (Belknap Aff. Ex. A). That same day, BDN obtained an Ex Parte Order For Process of Maritime Attachment of such of defendant's property, up to the amount of $2,881,741.73, which may be found in the hands of certain garnishees in this district, including the Bank of New York, American Express Bank, and Mashreq Bank. Process of Maritime Attachment and Garnishment was thereupon issued by the Clerk of the Court and served on the identified garnishees. (Belknap Aff. ¶ 4).

In the afternoon of May 22, 2006, the undersigned counsel for BDN received a letter via e-mail from Messrs. Rawle & Henderson LLP ("R&H"), counsel for The Bank of New York, reporting that BDN and a company named Essco Faith S.A., a plaintiff in an unrelated action pending in this District against defendant Tradeline (06-cv-01851(BSJ)),[1] had both restrained "funds in the amount of $1,896.87 being wire transferred through the Bank on May 19, 2006 to Tradeline L.L.C."  The letter further reported that "on March 28, 2006, funds being wire transferred through The Bank to Tradeline L.L.C. in the amount of $242,909.03 were restrained pursuant to a writ of maritime attachment served on behalf of Essco Faith S.A." (Belknap Aff. ¶ 5 and Ex. B).

Because R&H's May 22 letter was vague as to whether the Bank of New York was acknowledging that BDN's attachment was effective as to the funds originally attached by Essco Faith on March 28 as well as to the funds restrained on May 19, counsel for BDN wrote to R&H by e-mail dated May 24, 2006 making clear BDN's position that if "the Bank of New York [is] in possession of any funds of Tradeline which have been attached by Essco or any third party, then such funds are also subject to the attachment order and writ served on your clients on behalf of our client." (Belknap Aff., ¶ 8 and Ex. E).

Although BDN did not receive further confirmation from the Bank of New York acknowledging that its attachment extended to the funds previously restrained by Essco Faith on March 28, 2006, BDN's undersigned counsel nevertheless sent notice via

_____

[1] A copy of the Essco Faith complaint is attached to the Belknap Aff. as Exhibit C.

facsimile to Tradeline on May 25, 2006 that it had attached funds at the Bank of New York. (Belknap Aff., ¶ 9 and Ex. F). In that letter, BDN advised Tradeline that an action had been commenced in the Southern District of New York, that an order of attachment had been issued by the Court, and that BDN had been advised that funds had been restrained at the Bank of New York. BDN's notice enclosed a copy of its complaint. Although it also indicated that the May 22 letter from R&L was attached, that letter was inadvertently omitted. (Belknap Aff. ¶ 10). Accordingly, on May 30, 2006, BDN's undersigned counsel sent a second facsimile to Tradeline attaching a copy of the referenced letter. (Belknap Aff., ¶ 10 and Ex. G). At no time between May 25 and May 30 did BDN or its counsel receive any request from Tradeline or any representative thereof seeking a copy of the R&L letter which had been referenced but inadvertently omitted from BDN's May 25 notice of attachment. (Belknap Aff., ¶ 11).

On July 11, 2006, BDN's counsel received oral advice from American Express Bank that BDN had attached $81,565 of funds which had previously been restrained by Essco Faith.[2] (Belknap Aff., ¶ 12). On July 12, 2006, BDN's New York counsel received a telephone call from Michael Unger, Esq. of Freehill, Hogan & Mahar, LLP ("FHM") in which Mr. Unger advised that he represented defendant Tradeline and that Tradeline intended to move to vacate BDN's attachment. (Belknap Aff., ¶ 13).

---

[2] To date, although requested from American Express Bank, BDN has not received any written confirmation of the oral advice received from that bank concerning this attachment, nor has it received any further information about when these funds were restrained. (Belknap Aff. ¶ 16).

9

By e-mail dated July 12, 2006, counsel for BDN confirmed FHM's advice and provided them with notice pursuant to Local Rule B.2 of the attachment at American Express Bank. (Belknap Aff. Ex. H). Later on July 12, 2006, counsel for BDN received oral advice from Mashreq Bank that it had restrained funds in the amount of $184,000 which had also previously been restrained by Essco Faith. (Belknap Aff., ¶ 15). BDN provided Tradeline notice of this attachment via e-mail to FHM that same day. (Belknap Aff., Ex. I).[3]

On July 13, 2006, Counsel for BDN received further written notice from R&H advising that, in addition to the funds originally referenced in its May 22, 2006 letter, The Bank of New York had additionally restrained $254,004.48 on March 13, 2006 pursuant to writ filed by Essco Faith and that those funds were also now being restrained pursuant to BDN's attachment. (Belknap Aff. Ex. J). BDN provided notice to Tradeline of this attachment via e-mail to FHM that same day. (Belknap Aff. Ex. K).

## ARGUMENT

### POINT I

### BDN HAS MET ITS BURDEN TO SHOW WHY THE ATTACHMENTS SHOULD BE MAINTAINED

It is common ground between the parties that plaintiff bears the burden of proof in a Rule E(4)(f) post-attachment hearing. As will be detailed below in the context of the specific arguments raised by defendant, however, plaintiff disagrees with defendant as to

---

[3] Plaintiff has not to date received written confirmation of the details of this attachment, although requested. (Belknap Aff., ¶ 16).

the specific burden of proof which it must carry on certain issues. In particular, plaintiff contends that it should only be required to make a *prima facie* showing that its attachment is valid. <u>Blake Maritime, Inc. v. Petrom S.A.</u>, 2005 U.S. Dist. LEXIS 26310 (S.D.N.Y. 2005)(denying motion to vacate Rule B attachment, finding that "Plaintiff made a prima facie showing that it has a maritime claim against the defendant in the amount sued for and that defendant is not found in the District."). <u>Cf.</u>, <u>Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.</u>, 384 F. Supp. 2d 726, 729 (S.D.N.Y. 2005)(noting that plaintiff must show by a preponderance of the evidence that the attachment meets all technical requirements and is reasonably calculated to serve historical purposes of obtaining jurisdiction or securing a judgment).

In any event, to the extent that this Court concludes that plaintiff bears the burden to make any showing by a "preponderance of the evidence" but is unable to meet that burden on the basis of the present record, principles of fairness and due process dictate that plaintiff should be granted a fair opportunity to conduct limited discovery of defendant on such issue before this Court issues any adverse ruling.[4] In this respect, decisions relating to motions to dismiss for lack of *in personam* jurisdiction are closely analogous. <u>See</u> <u>e</u>.g., <u>Jesselson v. Blech Family Trust</u>, 1997 U.S. Dist. LEXIS 8211, *2-3 (holding that because plaintiff had not yet had an opportunity to conduct discovery, its burden of proof in opposing a motion to dismiss for lack of jurisdiction was to make a

---

[4] In the event this Court agrees discovery would be appropriate, BDN is prepared to propound its limited discovery requests within three business days of being directed to do so.

"*prima facie* case solely by allegations" notwithstanding that it ultimately would bear the burden of proof at trial to establish jurisdiction by a preponderance of the evidence).

## POINT II

### BDN'S CLAIM IS RIPE AND FULLY SUPPORTS A RULE B ATTACHMENT

Defendant contends that plaintiff's claims are "implied contractual indemnity" claims which are "unripe" until the plaintiff "has actually incurred an obligation or liability to a third party (here, Head Owners)." (Br. 5). This argument is without merit.

#### A. Plaintiff's Claims Are For Breach of Charter And Are Presently Ripe Under English Law

In the first place, contrary to defendant's assertion, plaintiff's claim is not one for "implied contractual indemnity" but is, instead, for breach of charter. Accordingly, contrary to defendant's assertion, plaintiff's claim is fully ripe. As is explained in the accompanying declaration of BDN's London barrister Benjamin Olbourne, "[t]he position under English law is more nuanced than is reflected in [defendant's] assertion." (Olbourne Dec. ¶ 7). Under English law, "the right to sue for a breach of contract accrues as soon as there is a breach of contract, notwithstanding that at that time no damage (beyond the purely nominal) has been suffered by the claimant." (Olbourne Dec. ¶ 8)(citation omitted). He further explains at paragraph 9 as follows:

> So far as indemnity contracts are concerned, a distinction may be drawn between (1) actions based on breach of contract, (2) actions based on express indemnity agreements, and (3) actions based upon implied indemnities. The rules for each of these categories are as follows:

> (1) <u>a claim for an indemnity based on a breach of contract will accrue in accordance with the basic or general rule for breach of contract, that is the cause of action will accrue at the time of the breach of contract.</u>  [Emphasis added.]
>
> (2) a claim for an indemnity based on an express indemnity agreement will accrue in accordance with the terms of that agreement ....
>
> (3) a claim for an indemnity based on an implied indemnity will normally be taken to be an indemnity against the discharge of a liability rather than against the incurring of that liability and the cause of action will be regarding as having accrued only when the liability is established and quantified.[5]

That plaintiff's claims in the present case are for breach of charter which are presently ripe is clear from the Verified Complaint, in which plaintiff asserts that "Pursuant to the Charter and/or <u>as a consequence of Defendant's breach thereof</u>, Defendant is liable to indemnify Plaintiff for all amounts claimed against it by Headowner as set forth [in the Complaint]."  (Belknap Aff., Ex. A, ¶ 12) (emphasis added).  It is also clear from plaintiff's September 12, 2003 letter to Tradeline, in which plaintiff summarized headowner's claim—which related to specific conduct and actions undertaken <u>by defendant</u> as sub-charterer—and plaintiff's intent that "when Points of Claim are served on our clients, <u>we will serve back-to-back submissions on the sub-charterers</u> ...." (Whelan Dec. Ex. F)(emphasis added).

Mr. Olbourne ultimately opines (¶ 17) as follows:

> BDN's claim to be indemnified by Tradeline will have arisen, and its cause of action for an indemnity will have accrued, at

---

[5] For a more detailed discussion of this point, including discussion of relevant English authorities supporting this view, see Olbourne Dec. ¶¶ 8-14 and Exs. B-G.

the time of Tradeline's alleged breaches of the Sub-Charter, namely in or around April 2001. BDN's commencement of arbitration against Tradeline in October 2001 can not, therefore, be regarded as premature as a matter of English law.

As Mr. Olbourne notes, this conclusion is further supported by the conclusion that "[a]s BDN's claim is founded on a '*simple contract*' . . . it must be commenced within six years of the date on which the cause of action accrued. This date will be the date of the breach of the contract, not the date on which any damage was suffered or any liability ascertained." (Olbourne Dec., ¶ 18) (citation omitted). It hardly needs be said that it would be a perverse result indeed if plaintiff's claim against Tradeline was sufficiently ripe that it would be timebarred if not asserted within 6 years of defendant's breach of the charter and yet "premature" for the purposes of seeking and obtaining security within that same time period. (Olbourne Dec. ¶¶ 18-20).

**B.** **In Any Event, This Court Should Exercise Its Discretion To Allow Attachment In The Present Case**

Even if the Court concludes that plaintiff's claims are merely for implied indemnity rather than for breach of charter, this Court should nevertheless exercise its discretion to allow the attachment to stand. Whether to allow an attachment in respect of claims seeking indemnification is within the sound discretion of the Court. Staronset Shilling, Ltd. v. North Star Navigation Inc., 659 F. Supp. 189, 191 (S.D.N.Y. 1987)(citing Greenwich Marine v. S.S. Alexandra 339 F.2d 901 (2d Cir. 1965)). Guiding the exercise of that discretion are factors such as the likelihood that claims will actually be asserted against the plaintiff for which security is sought from defendant; the status of

such claims against the plaintiff; and the status of plaintiff's claims against defendant on the merits (*i.e.*, where, as here, the merits will be adjudicated in a forum other than the one in which the attachment is being sought—here, London arbitration). See id. See also Daeshin Shipping Co Ltd v. Meridian Bulk Carriers, Ltd., 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. 2005).

As defendant correctly notes, some courts have exercised their discretion to vacate attachments where the claims underlying the attachment were vague or speculative in nature. Greenwich Marine (holding claim was premature where plaintiff sought indemnity on claim in respect of which it had not yet been sued); Eitzen Sealift A.S v. Cementos Andinos Dominicanos, SA, 2005 U.S. Dist. LEXIS 19876 (S.D.N.Y. 2005)(discussing factors considered by court in Greenwich Marine and vacating, on facts of that case, an attachment for claim only for costs and fees expected to be incurred in respect of a London arbitration on an indemnity claim which had yet to be initiated); T&O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A., 415 F. Supp. 2d 310 (S.D.N.Y. 2006)(concluding that the plaintiff had failed to make a *prima facie* showing that the Inter-Club Agreement incorporated in the charter did not require an "accrued" cause of action before an indemnity claim could be commenced against the defendant in London arbitration).

Nevertheless, the Court's discretion to uphold a Rule B attachment in respect of an indemnity claim is clear and well established. Greenwich Marine, 339 F.2d at 905. In Staronset, for instance, a stevedore brought suit against a vessel owner and arrested the vessel. Owner posted security and commenced an indemnity action against the charterer

338491.1                                    15

of the vessel. Owner thereupon obtained a Rule B attachment of charterer's assets, and the charterer moved to vacate on the ground that the claim was premature. In upholding the attachment, the Staronset court ruled as follows:

> The charterer also argues that the attachment should be vacated on the ground that the instant action is premature, since no cause of action will arise until such time, if ever, as the ship owner incurs actual liability. As the opinion of Judge (now Justice) Marshall in Greenwich Marine v. S.S. Alexandra (2d Cir. 1965) 339 F.2d 901 suggests, that question is committed to our discretion. In the exercise of our discretion, we believe that the ship owner's concerns are reasonable and that he is entitled to the security which he seeks. [Id. at 190.]

Defendant remarkably seeks to distinguish Staronset on the grounds that it is the "only" decision to "even slightly relax this principle …" that an indemnity claim for a liability which is not established is unripe. (Br. 6). In doing so, defendant either ignores or overlooks the decision in Daeshin, 2005 U.S. Dist. LEXIS 22409, but either explanation for defendant's omission is inexcusable inasmuch as (1) the decision is directly on point and squarely in plaintiff's favor, and (2) defendant's present counsel also acted for the defendant in that case. The plaintiff and defendant in Daeshin were in precisely the same posture as the parties in this case: *i.e.*, plaintiff had chartered the vessel from a third party and had then sub-chartered the vessel to the defendant. Plaintiff sought an attachment in respect of a $350,000 claim for physical damage to the vessel asserted by the headowner against it in London arbitration. The headowner had commenced arbitration against plaintiff and plaintiff had, in turn, commenced arbitration against the defendant. None of the parties had yet served Points of Claim; however, the

headowner had provided to plaintiff a breakdown of its claim and had provided some documentary evidence to both plaintiff and defendant in support. In upholding plaintiff's attachment, the court noted as follows:

> Thus, this case is distinguishable from Greenwich Marine …, relied on by [defendant], because in that case there was little indication that the damage claim would actually be passed through a chain of charter parties and asserted against the plaintiff. After reviewing the record, we find that it is not unduly speculative to assume that the physical damage claims are being asserted down the chain of charter parties and that plaintiff has a reasonable belief that it faces potential liability totaling $350,000 for those damages. We therefore find it appropriate to include this claim in the total amount that plaintiff is entitled to attach as security.

Change the underlying claim from vessel damage to cargo damage,[6] and Daeshin is otherwise identical to the present case. (See Whelan Dec. ¶¶ 4-18). There can be no question in the present case about the reasonableness of plaintiff's concern that it faces potential liability to headowner—that party has already commenced arbitration against plaintiff and has provided an explicit and detailed breakdown of its claims. Headowner has asserted that it has completed formal Points of Claim and is only refraining from serving them so that the parties can continue to explore settlement. (Whelan Dec., Ex. F, p. 1). In short, headowner's claim is present and fully articulated, and it is not, as defendant contends, speculative. Accordingly, plaintiff's attachment here should be upheld.

---

[6] That the underlying claim in Daeshin was for vessel damage and the underlying claim is for cargo damage is a distinction with a difference.

### C. Plaintiff's Claim is Not Stale And, In Any Event, This Court Should Not Look Beyond Plaintiff's *Prima Facie* Case Because The Merits Are Subject To London Arbitration

Defendant's contention that the underlying claims by headowner have become "stale" is based on factually erroneous assertions and is, in any event, irrelevant. As is fully detailed in the accompanying declaration of Kathryn Whelan, plaintiff's London solicitor, there has in fact been substantial activity in this matter between 2001, when the cargo damage occurred, and the present. Indeed, a three-way settlement meeting among English lawyers for the headowner, plaintiff and defendant occurred as recently as April of 2005, following which the parties agreed to a "without prejudice" exchange of expert reports and a meeting of experts which occurred on November 9, 2005. (Whelan Dec. ¶ 18). Moreover, in March of 2006 headowner sent a letter to both plaintiff and defendant reiterating its claim and providing a "refined" calculation of its damages in view of the fact that there was "now substantially more evidence on this topic available than there was at the time we wrote our earlier letter." (Whelan Dec., ¶ 16).[7]

Similarly, defendant's contention that it was deprived of a fair opportunity to investigate the claim is clearly refuted by the Whelan Declaration. (See ¶¶ 23-25). As she make clear, Tradeline was on notice of headowner's and plaintiff's claims in 2001 and had full opportunity to investigate the claims at that time, if it had so desired. (Indeed, defendant has submitted no evidence to suggest that it did not do so.) Moreover,

---

[7] In any event, as is made clear in the Whelan Declaration, headowner's claims could not be struck out for want of prosecution at least until the time bar period—here six years or roughly until April 2007—had expired. (Whelan Dec., ¶¶ 19-22).

headowner has provided it with survey reports and certificates, all of which are customary evidence in London arbitrations concerning cargo damage claims. (Whelan Dec., ¶ 24). In short, defendant's suggestion that plaintiff's claim is weak on the merits due to a lack of evidence is baseless.

In any event, Defendant's entire argument in this respect is a red herring. It is not for this Court to delve into the merits of the underlying dispute—particularly here, where the parties have agreed that the claims are subject to English law and arbitration in London. As the court explained in <u>North of England Protecting and Indem. Assoc. v. M/V NARA</u>, 1999 U.S. Dist. LEXIS 22375, *4-5 (E.D. La. 1999):

> Under Rule E(4)(f), the plaintiff must show that reasonable grounds exist for the arrest and attachment and that it should be maintained. <u>A rule E(4)(f) hearing is not intended to definitely resolve the dispute between the parties, but only to make a preliminary determination of whether there are reasonable grounds for issuance of the arrest warrant, and if so to fix an appropriate bond. Here, the merits of the case, which may involve questions of English law, will ultimately be adjudicated by an arbitration panel in England.</u> At this stage in the proceedings, plaintiff merely needs to show "probable cause" for the issuance of the warrant and writ. Courts sometimes characterize this burden as a requirement to make a *prima facie* showing that plaintiff is entitled to the damages sought and secured by the arrest and attachment. [Citations omitted; emphasis added.]

<u>See</u> <u>also</u> <u>Thypin Steel Co. v. Certain Bills of Lading</u>, 1996 U.S. Dist. LEXIS 5909, *12-13 (S.D.N.Y. 1996)(plaintiff's burden at the post-arrest hearing is to produce evidence sufficient to show that the arrest was supported by reasonable grounds).

In sum, defendant's protestations concerning the merits of plaintiff's claims—besides being factually misleading and erroneous—are totally irrelevant. Plaintiff has

stated a *prima facie* valid claim for breach of charter against defendant, and its attachment of defendant's property within this District should be upheld.

## POINT III

### BDN PROVIDED ADEQUATE NOTICE OF ATTACHMENT PURSUANT TO LOCAL RULE B.2

Tradeline's contention that BDN failed to give prompt notice of its attachments is entirely without merit. In the first place, it is to be noted that Tradeline's argument pertains solely to BDN's notice of attachment of funds at the Bank of New York to the extent reflected in the Bank of New York's counsel's May 22, 2006 letter (*i.e.*, the $1,896.87 restrained on May 19, 2006 and the $242,909.03 originally restrained by Essco Faith on March 28, 2006), and not to any of the other funds attached by BDL. Indeed, Tradeline implicitly concedes that BDL's notices relating to its attachments at American Express Bank and Mashreq Bank—as well as the subsequent notice of further attachment at Bank of New York—were "prompt" within the meaning of Local Rule B.2 inasmuch as in each instance, notice was given either on the day information was received from the respective bank or on the following day. (See Belknap Aff, ¶¶ 12-18 and Exs. H-K). (Br. 10)(acknowledging that notice within one or two days would have been prompt).

As to the initial notice of restraint of funds at the Bank of New York, Tradeline distorts the facts to suggest that BDN waited two weeks to provide notice of the attachment. This is simply not the case. As the foregoing discussion makes clear, BDN first received notice that funds had been restrained by the Bank of New York when it received R&H's letter in the afternoon of May 22, 2006. (Belknap Aff. ¶ 5, Ex. B). As

Tradeline admits, (Br. 9), it received notice of these attachments on May 25, *i.e.*, three days later.

Tradeline would have BDN be responsible to give notice as of the moment funds are restrained by a garnishee—as opposed to when BDN first was given notice of the restraint by the garnishee—but this is plainly an unworkable interpretation of the rule. (Br. 9). Clearly, a plaintiff's obligation to give notice of an attachment can not begin to run until that plaintiff itself obtains knowledge of the attachment. Such information can only come from notice provided by the garnishee.

There can be no doubt that, in the present circumstance at least, three days fits well within the definition of "prompt" as that term is used in Rule B.2. Indeed, as noted above, even Tradeline fully concedes that notice within <u>two</u> days constitutes prompt notice, (Br. 10), and it therefore defies logic to suggest that the passage of a single additional day would justify vacating the attachment, as Tradeline contends. Unquestionably, any analysis of what constitutes "prompt" notice must take all relevant circumstances into account, and even if three days' notice would not be considered "prompt" in some circumstances, it clearly must be so viewed here given that: (1) all but $1,896.87 of the funds had previously been restrained by Essco Faith in another Rule B proceeding and had been sitting at the Bank of New York subject to that attachment since March 28, 2006 without any action by Tradeline to obtain their release; (2) Tradeline waited until July 12, 2006 to make an application to vacate BDN's attachment notwithstanding that it admittedly received notice of the attachment on May 25, 2006; and (3) to date, Tradeline has not applied to vacate Essco Faith's March 28, 2006

attachment at the Bank of New York, such that even if it is successful in the present motion the funds will nevertheless remain restrained.  (Belknap Aff., Ex. D).

In short, Tradeline suffered no prejudice as a result of the passage of three days between the time BDN first became aware of the attachment and the time that it first notified Tradeline, and any suggestion to the contrary is clearly belied by Tradeline's own substantial delay in taking any action once it received notice of the attachments.

Tradeline suggests, (Br. 9), that the May 25 notice was insufficient because it failed to include the "needed details of the restraint," which details were only allegedly provided on May 30, 2006.  Although the May 25 letter admittedly omitted the May 22 letter from the Bank of New York as an enclosure, however, it was clearly referenced such that Tradeline could have inquired for a copy if it had so desired.  It did not do so, and in any event a copy of the Bank of New York's letter was provided to Tradeline on May 30, 2006.

Even without a copy of the Bank of New York's May 22 letter, moreover, the notice given to Tradeline on May 25 was entirely adequate.  Rule B.2 merely requires that notice of the attachment be given—it contains no requirement that a copy of any notification provided by the garnishee to the plaintiff be provided to the defendant.  The notice provided by BDN's May 25 letter provided a copy of the complaint and identified the Bank of New York as garnishee, and that is all that is required under the Rule.

In sum, Tradeline's objections to the adequacy of BDN's notice of attachment are frivolous and should be dismissed.

**POINT IV**

**MAINTAINING BDN'S ATTACHMENT IS EMINENTLY FAIR UNDER THE CURCUMSTANCES**

Tradeline contends that BDN does not have a *bona fide* "need" for security and that its attachment of Tradeline's funds in New York is consequently "unfair." This argument is baseless.

**A.    Plaintiff's Proposed "Need" Test Should Not Be Followed**

There is a split of authority in this District concerning whether this is even an inquiry which the Court properly may make.  In <u>Blake Maritime, Inc. v. Petrom S.A.</u>, 2005 U.S. Dist. LEXIS 26310, *7 (S.D.N.Y. 2005), the Court noted as follows:

> On its face, the Rule does not mandate a showing of need or necessity in order for plaintiff to obtain security.  In fact, the notes accompanying the 1985 amendments to Supplemental Rile B expressly state:  "The rule envisions that the order [of attachment] will issue when the plaintiff makes a *prima facie* showing that he has a maritime claim against the defendant in the amount sued for and the defendant is not present within the district."  There is no mention of a showing of necessity or fairness at all.  <u>In admiralty, given the rapid movement of ships, cargo and other assets, the need for obtaining security appears to be presumed by the Rule.</u>  [Brackets in original; emphasis added; citations omitted.]

<u>See also</u> <u>Parkroad Corp. v. China Worldwide Shipping Co.</u>, 2005 U.S. Dist. LEXIS 11122, *3 (S.D.N.Y. 2005)("Rule B envisions that the order [for process of maritime attachment and/or garnishment] will issue when the plaintiff makes a *prima facie* showing that he has a maritime claim against the defendant in the amount sued for and the defendant is not present in the district.")(citing Advisory Committee Notes to the 1985 Amendment.); <u>North of England Protecting and Indem., Assoc., Ltd. v. M/V</u>

<u>NARA</u>, 1999 U.S. Dist. LEXIS 22375, \*4-5 (E.D. La 1999)(noting that during a rule E(4)(f) hearing, "plaintiff merely needs to show "probable cause" for the issuance of the warrant and writ. Courts sometimes characterize this burden as a requirement to make a *prima facie* showing that plaintiff is entitled to the damages sought and secured by the arrest and attachment.")(emphasis added; citations omitted).

A few recent decisions, on the other hand, have imposed an additional obligation upon a plaintiff seeking to maintain a Rule B attachment. Judge Scheindlin stated her view of the rule in <u>Allied Maritime, Inc. v. The Rice Corp.</u>, 2004 U.S. Dist. LEXIS 20353, \*5 (S.D.N.Y. 2004):

> The plaintiff may therefore show that the attachment should not be vacated by demonstrating either that the attachment is necessary for the plaintiff to obtain jurisdiction in a convenient district, *or* that the plaintiff needs the security of the attachment to satisfy any judgment it may win in the underlying suit.

<u>See</u> <u>also</u> <u>Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.</u>, 384 F. Supp. 2d 726, 729 (S.D.N.Y. 2005)("At an attachment hearing, the plaintiff must show, by a preponderance of the evidence, that the attachment order not only meets all technical requirements but also is reasonably calculated to serve at least one of the two historical purposes of obtaining jurisdiction or securing a judgment and is not simply a tactical device designed to harass the adversary in an ongoing litigation.");[8] <u>Seaplus Line Co. Ltd. v.</u>

---

[8] The <u>Aqua Stoli</u> decision is currently on appeal to the Second Circuit (Docket No. 05-5385 CV) on the issue of whether the district court erred in requiring that a plaintiff demonstrate a "need" for security to be entitled to an attachment under Rule B. Healy & Baillie, LLP are representing Appellee in that matter. Oral argument was held on March 2, 2006.

Bulkhandling Handymax AS, 409 F. Supp. 2d 316 (S.D.N.Y. 2005)(following Allied and Aqua Stoli).

The "need" test espoused by defendant and followed by courts such as Allied and Aqua Stoli is nowhere found in the language of Rule B. And as this Court observed in Yayasan Sabah Dua Shipping Sdn Bhb v. Scandinavian Liquid Carriers Ltd., 335 F. Supp. 2d 441, 444 (S.D.N.Y. 2004)(J. Kaplan):

> Maritime attachment is a feature of admiralty jurisprudence that antedates both the congressional grant of admiralty jurisdiction to the federal district courts and the promulgation of the first Supreme Court Admiralty Rules in 1844. Admiralty Rule B … contains the current provisions governing maritime attachment. Rule B is simply an extension of this ancient practice.

Citing Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 267-68 (2d Cir. 2002). As the Blake court held, 2005 U.S. Dist. LEXIS 26310 at *8, "[w]hile the 'any other deficiency' language in Supplemental Rule E(4)(f) is broad, it does not suggest that a new test can or should be adopted merely because the definition of property subject to seizure has changed."

### B. In Any Event, Plaintiff's Need For Security Is Clear

Ultimately, the question of whether the "need" test is a proper one need not be decided here, because there can be no doubt that plaintiff's need in the present case is very real and that the preponderance of the evidence clearly weighs in favor of maintaining the attachment. Indeed, defendant's own evidence is the most damning in this respect. As defendant readily admits, according to its own financial statements, it

had net profits in 2005 of a mere $1,719,756.06.[9]  This is to be contrasted with the claim

in the present case, which is for $2,653,524.23, *i.e.*, nearly a million dollars more than

Tradeline's entire net profit for last year, and well over twice Tradeline's cash and bank

balance as of 2005.  (See Somnath Dec. at ¶ 10 and Ex. A).  Tradeline is also to be

contrasted with the defendants in Allied, which was "one of the largest rice trading

companies in the world," had annual sales of $575,000,000, and maintained an office in

California, Allied at *8; in Aqua Stoli, which had been in existence for more than 80

years and had annual revenues exceeding $800,000,000, Aqua Stoli at 727; and in

Seaplus, where the defendant had revenues of $110,000,000 net of vessel-related

expenses.  Seaplus at 323.

The simple and obvious fact is that the defendants in those other cases were huge

multi-national companies with solid and established international reputations and world-

wide presence, and with revenues many orders of magnitude larger than those of the

defendant here.  Tradeline, meanwhile, claims net revenues of well under $ 2 million and

"net assets" of only $16 million, virtually all of which are in the form of "accounts

receivable,"  (See Somnath Dec., Ex. A p. 2), which are notoriously intangible.  Tradeline

are not the registered owners of any vessels, and, while they apparently charter a number

of ships, the opportunities to arrest time-chartered vessels are strictly limited.  (Whelan

Dec. ¶ 30).  Put simply, Tradeline is a small, regional company whose only real presence

---

[9] Plaintiff does not accept defendant's financial statement and other evidence as accurately representing defendant's financial position, and if the Court is inclined to accept defendant's evidence as sufficient on this point then plaintiff should be entitled to limited discovery from defendant on this issue.

is in the United Arab Emirates, an historically difficult place for a foreign company to enforce an arbitration award or judgment. (Whelan Dec. ¶ 30).

Defendant's self-serving assertions that "[i]t is inconceivable that Tradeline would be able to pay a hypothetical award or judgment in the amount claim by Plaintiff" and that it "stands fully ready, willing and able to pay any sums awarded to Plaintiff," (Somnath Dec. at ¶ 11), are as hollow as they are unconvincing. See <u>Blake</u> * 11 (finding that financial information submitted by defendant was no "proof of Defendant's willingness and ability to pay a future judgment that might arise from the London arbitration."). Moreover, defendant's assertions of good intent are no substitute for adequate financial security.[10] Indeed, the very purpose of the maritime attachment remedy is to promote international trade and transactions by affording a party engaged in maritime commerce comfort that it will have some ability to enforce its rights—and, particularly, any judgment it might obtain—in the event a dispute arises with a party located half way around the world. As this Court has observed of the Rule B attachment:

> The device exists for the benefit of merchants engaged in the far flung maritime trade, who face special risks in seeking legal redress against perpetrators of maritime injury [who] are likely to be peripatetic. Without it, defendants, their ships, and their funds easily could evade the enforcement of substantive rights of admiralty law. [Citations and quotations omitted.]

---

[10] Contrary to defendant's assertion, plaintiff <u>did</u> request that defendant voluntary post security for its claims. (Whelan Dec., ¶ 8, Ex. D). Defendant has failed to comply with that request.

<u>Yayasan</u>, 335 F. Supp. 2d at 444.  <u>See</u> <u>also</u> <u>Blake</u> 2005 U.S. Dist. LEXIS 26310 at *7

("In admiralty, given the rapid movement of ships, cargo and other assets, the need for

obtaining security appears to be presumed by the Rule.").

Plaintiff's insecurity is even more justified in the present case given that there is

currently another action pending in the Southern District of New York against Tradeline

by a company called Essco Faith (06-cv-01851), and the claim stated in that complaint is

for US $3,913,000, or well over <u>twice</u> Tradeline's entire net profit for 2005.  Essco Faith

has attached virtually all the same funds attached by BDN in this action (*i.e.*, totaling US

$764,375.31), which by Tradeline's own admission represents a restraint of funds

equivalent to nearly one-half of its net profits from all of last year.  (Somnath Dec. at ¶

10).  This substantial claim, and the attachment by Essco Faith of such a significant share

of Tradeline's assets, raises serious and legitimate concern that any judgment eventually

obtained by plaintiff herein will go unsatisfied.

Moreover, if the Court were to vacate plaintiff's attachment, it would unfairly

prejudice plaintiff vis-à-vis other creditors—and particularly Essco Faith—which are

simultaneously seeking to secure their claims against Tradeline.  Accordingly, plaintiff

faces the possibility that its attachment will be vacated and that it will thus lose any

priority it might have vis-à-vis Essco Faith or other creditors in respect of its claim

against any of those funds.  This would particularly be the case in respect of the funds

attached on May 19, 2006, since both BDN and Essco Faith attached those funds on the

same day.  <u>See</u> <u>Central Hudson Gas & Elec. Corp. v. Empressa Naviera Santa, SA</u>, 845 F.

Supp. 150 (S.D.N.Y. 1994), <u>aff'd</u>, 56 F.3d 359 (2d Cir. 1995)(holding that Rule B was

not abused where there was a substantial risk that plaintiff "would otherwise not be able to locate sufficient assets to satisfy its claims").

In the meantime, defendant has not even alleged—much less established—any prejudice that would befall it by maintaining plaintiff's attachment in this case. Indeed, as noted above, although Essco Faith commenced suit and has attached all of the same funds attached by plaintiff herein—some as long ago as March 2006—defendant has, to date, taken <u>no action</u> to seek to vacate those attachments. (Belknap Aff., Ex. D). Even in respect of plaintiff's attachment, defendant waited until July 12, 2006 to make the present motion notwithstanding that it admittedly learned of the attachment on May 25, 2005. In sum, defendant has shown no particular harm which would justify denying plaintiff of its otherwise valid Rule B attachment. <u>See</u> <u>Blake</u> at *11-12 (denying motion to vacate attachment because "Defendant has not identified with any precision exactly what harm it has experienced by way of the attachment.").

## CONCLUSION

For the foregoing reasons, plaintiff BDN respectfully submits that defendant's motion to vacate BDN's attachments should be DENIED and plaintiff BDN should be granted such other and further relief as the Court may deem just and equitable.

Dated:  New York, N. Y.
      July 31, 2006

                     HEALY & BAILLIE, LLP
                     Attorneys for Plaintiff
                     BOTTIGLIERI DI NAVIGAZIONE SPA

                     By:              /s/
                           Thomas H. Belknap, Jr. (TB 3188)
                         A Member of the Firm
                     61 Broadway
                     New York, New York 10006
                     (212) 943-3980