HEALY & BAILLIE, LLP
Attorneys for Plaintiff
BOTTIGLIERI DI NAVIGAZIONE SPA
61 Broadway
New York, New York 10006
(212) 943-3980
Thomas H. Belknap, Jr. (TB-3188)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BOTTIGLIERI DI NAVIGAZIONE SPA<br><br>Plaintiff,<br><br>-against-<br><br>TRADELINE LLC,<br><br>Defendant. | Docket No.: 06 Civ. 3705 (LAK) |

**DECLARATION OF KATHRYN WHELAN IN OPPOSITION TO THE MOTION BY TRADELINE LLC TO VACATE ATTACHMENT**

**KATHRYN WHELAN**, pursuant to Title 28, § 1746 of the United States Code, hereby declares and says the following under penalty of perjury:

1. I am a solicitor of the Supreme Court of England and Wales and I am an employed solicitor with Consult Marine Ltd., 30 Hobbs Court, 2 Jacob Street, London SE1 2BG. I make this declaration on behalf of the plaintiff, Bottiglieri di Navigazione SpA ("BDN"), in opposition to the motion to vacate attachment by the defendant, Tradeline LLC.

2. Insofar as the contents of this declaration are within my own knowledge they are true. Insofar as the contents of this declaration are not within my

own direct knowledge, they are true to the best of my information and belief.

3. Tradeline has submitted a Memorandum of Law, together with Declarations by John Habergham and Captain Punnoli Iruppattil Somnath, in support of its application to vacate BDN's Rule B attachment of funds. I provide herein a general narrative of the facts and circumstances surrounding BDN's claims against Tradeline for breach of charter and also respond to certain specific allegations and submissions made in Tradeline's Memorandum of Law, the Habergham Declaration, and Somnath Declaration.

4. The facts that give rise to this dispute are set out in paragraphs 4-8 of the Verified Complaint that was filed on behalf of BDN in its original application. Briefly, BDN and the head owners entered into a charter party on or about 9th February 2001 for the "KAVO DELFINI" (the "Headcharter"). A true and accurate copy of the Headcharter is attached as Exhibit A.

5. By sub-charterparty dated 26th January 2001, BDN, as disponent owner, sub-chartered the vessel to Tradeline (the "Subcharter"). A true and accurate copy of the Subcharter is attached as Exhibit B.

6. Pursuant to the Headcharter and the Subcharter, the vessel loaded a cargo of maize and soya bean meal in bulk at Gral Lagos and Parangua, Argentina in March 2001 for carriage to B.I. Khomeini, Iran and arrived at the discharge port on about 9th April 2001. The cargo receivers alleged on discharge that part of the maize cargo was outturned in damaged condition. After discharge had been completed, the cargo receivers consequently detained the vessel at the discharge port and only released her over 11 days later

after they were provided with security by the headowner in the amount of US$2,750,000.

7. By letter dated 25 October 2001, the undersigned declarant acting on behalf of BDN formally put Tradeline on notice that BDN was asserting claims against it for breach of charter under the charter party. In that correspondence, BDN notified Tradeline of its appointment of Mr. Patrick O'Donovan as arbitrator "in respect of any and all disputes arising out of the above charterparty." A true and accurate copy of this letter is attached as Exhibit C.

8. By letter dated 13 November 2001, the undersigned declarant responded to a request by Tradeline for clarification of BDN's claims, noting that headowners had asserted claims against BDN for demurrage and detention. In this same correspondence, BDN requested that, in light of the nature of the claims being asserted, Tradeline agree to participate in arbitration directly with headowner since the charters are "back to back" (*i.e.*, on identical terms) and also agree "to secure the claim in the meantime." A true and accurate copy of this letter is attached as Exhibit D.

9. By letter dated 26th February 2003, the undersigned declarant received from headowner's London Solicitors, Messrs. Shaw & Croft, a letter setting forth headowner's claims for freight, demurrage, and detention allegedly resulting from BDN's breach of the Headcharter in respect of the voyage. A true and accurate copy of this letter, without the accompanying schedules and calculations, is attached as Exhibit E.

10. By letter to the undersigned declarant dated 12th September 2003, Messrs. Shaw & Croft referred to previous correspondence in respect of headowner's claim "dating back to February 2003" and gave further notice and detail of its claim against BDN resulting from alleged damage to the

cargo of corn, which it stated "falls into three categories: (1) freight (2) demurrage and (3) detention or damages for breach of charterparty." In that letter, Messrs. Shaw & Croft set forth in some detail the various heads of the headowner's claim. A true and accurate copy of this letter is attached as Exhibit F.

11. As to headowner's claim for breach of contract, Shaw & Croft stated at page three of their 12th September 2003 letter (Ex. F) as follows:

> The charterparty expressly provided by rider clause 10 that "the cargo shall be ... taken from the holds and discharged by the charterers or receivers without risk, liability and (sic) whatsoever to owners." Furthermore it was an implied term of the charterparty that:
>
> 1. the charterers would tender for loading cargo of such a type and in such a condition as would be considered reasonable in the light of the provisions of the charterparty; and/or
>
> 2. the cargo would be such that it could be loaded, carried and discharged without breach of the local law in force at the loading and discharging ports.

12. In the same letter, Headowner further stated its basis for BDN's alleged breach of charter as follows:

> In breach of the charterparty your clients failed to tender a reasonable cargo for carriage and/or failed to tender a cargo which could be discharged without breach of the local law. According to [a survey report prepared for headowner], the pre-shipment treatment of the cargo of maize loaded by your clients made it particularly susceptible to the development of mould. Further, your client ordered the vessel to load a cargo in Argentina when they knew or should have known that Iranian regulations did not permit the importation of cargo originating from Argentina. In addition, your clients knew or should have known that the cargo was

> likely to be subject to inspection by the Iranian Veterinary Organisation and the presence of, inter alia, mould would very probably result in the cargo being condemned by that body. A small part of the maize cargo did indeed become mouldy, without fault on the part of our clients. The cargo of maize in holds 1 and 6 was condemned by the Iranian Veterinary Organization as being unfit for animal consumption due to mould and in consequence the receivers ... rejected the cargo and obtained an Iranian court order preventing the vessel from departing from Iran.

13. Finally, Shaw & Croft explained in its 12th September letter, (Ex. F), the steps taken by headowner to respond to the cargo receivers' claims:

> In order to mitigate their losses our clients were obliged to provide security in the sum of US$2,750,000 so as to obtain the release of their vessel. Thereafter our clients compromised the claim made against them for US$2,080,000 and took steps to mitigate their loss by selling the rejected cargo to other buyers for US$823,969.92. Owners now claim their net loss as a result of the rejection of the cargo, being the cost of the claim paid to receivers less the proceeds of the salvage sale or US$1,256,030.08.

14. Upon receiving headowner's further clarification of its claim as set forth in its 12th September 2003 letter, (Ex. F), on 15th September 2003 the undersigned declarant wrote to John Habergham, solicitor for Tradeline, forwarding a copy of Shaw & Croft's letter and advising that headowner's "claim includes damages for breach of contract of US$1,256,030.08 in respect of receivers claim, following their rejection of the cargo, less the proceeds of the salvage sale." A true and accurate copy of this letter is attached as Exhibit G. The undersigned further wrote in that same letter as follows:

> The basis of the claim is that pre-shipment treatment of the cargo of maize made it susceptible for the

> development of mould, Iranian regulations did not permit the import of cargo originating from Argentina (where the vessel was ordered to load) and that the presence of mould was likely to cause the cargo to be rejected by the Iranian Authorities. These are all matters within the control of your clients and when Points of Claim are served on our clients, we will serve back-to-back submissions on the sub-charterers and maintain an application for the arbitrations to be consolidated.

15. In addition to the correspondence specifically referenced above, there has been substantial additional correspondence among the parties concerning this dispute. Attached as Exhibit H is a listing of all correspondence and meetings involving headowner, BDN and Tradeline relating to this matter. As can be seen, many of the communications have been on a "without prejudice" basis in an attempt to negotiate a settlement of the claims; accordingly, I am not able to disclose the contents of those communications. As can be seen, however, there has in fact been substantial activity in this matter through 2003 to 2006.

16. Indeed, by letter dated 31st March 2006, Messrs. Shaw & Croft sent a further letter to BDN, with copy to Tradeline's solicitors, noting that "[s]ince the date of [headowner's 12 September 2003—Ex. F] letter of claim both parties have investigated the cause of the cargo damage and there is now substantially more evidence on this topic available than there was at the time we wrote our earlier letter." Shaw & Croft then proceeded to set forth in substantial detail the basis of headowner's claim against BDN for demurrage, detention and breach of contract and also provided their comments on the defences raised by Tradeline. A true and accurate copy of this letter is attached as Exhibit I.

17. It is correct that, to date, no formal submissions have been served in either of the arbitrations. Nevertheless, the statements (1) that "there has been no indication the Head Owners will ever be pursuing their claims against BDN," (Br. 3); (2) that "to say that the head arbitration has stalled is an understatement," (Habergham Declaration ¶ 10); and (3) that headowner's arbitration "appears to have been abandoned," (Somnath Declaration ¶ 13), are all plainly incorrect. As the appended correspondence and the long list of other communications annexed as exhibit H make very clear, the parties have been actively pursuing their claims. The clear and obvious explanation for why formal submissions have not been served to date is that the parties have been actively engaged in settlement discussions in the hope of obviating the need and expense of conducting the arbitrations.

18. For instance, a tri-partite "without prejudice" meeting took place among the solicitors for headowner, BDN and Tradeline on 6th April 2005, as a result of which experts exchanged "without prejudice" reports and there was a preliminary "without prejudice" meeting of experts on 9 November 2005 to consider the possible cause of the cargo damage and to see whether there was any common ground. (See Exhibit H). Notably, BDN and Tradeline made a joint appointment of an expert for this purpose.

19. Even if the evidence did indicate that the headowner's arbitration had not been progressed or had been abandoned, which is entirely denied here, as a matter of English law BDN would not be in a position to apply for the headowners' claim to be struck out for inordinate and inexcusable delay, at very least until the limitation period of 6 years has expired: see Lazenby v. McNicholas (1995) 2 Lloyd's Rep. 30. (Exhibit J). In that case, the court held that it would be an error of law for an arbitrator to dismiss a claim within its limitation period barring exceptional circumstances. The claim there arose under the Arbitration Act, 1950 s.13A (added by the Courts and

Legal Services Act 1990) which provided that an arbitrator shall have power to make an award dismissing any claim if it appears to him that (a) there has been inordinate and inexcusable delay on the part of the claimant in pursuing the claims and (b) that the delay (i) will give rise to a substantial risk that it is not possible to have a fair resolution of the issues in that claim, or (ii) has caused, or is likely to cause or to have caused, serious prejudice to the respondent. An application was made by the defendant to strike out the claim prior to the expiration of the limitation period but it was not successful. The reasoning behind the judgment is that if an action is dismissed for want of prosecution that will not prevent the initiation of fresh proceedings within the limitation period. Furthermore, prior to the expiration of the limitation period, delay within the limitation period cannot properly be regarded as inordinate although it may be taken into account when considering an application after the limitation period has expires. If the parties wish to curtail the statutory limitation period of 6 years, they should do so within their arbitration agreement.

20. The relevant law at the time of Lazenby v McNicholas was the 1950 Arbitration Act, which has since been replaced by the 1996 Arbitration Act. The law relating to arbitrations remains as stated in the above case but an application to the tribunal to dismiss the claim would now be made under section 41(3) of the 1996 Act. (Exhibit K). That section replicates, in almost identical terms, the provisions that were previously contained in section 13A of the Arbitration Act 1950 and once the limitation period has expired, the party who has applied to have the arbitration dismissed must show that there has been inordinate and inexcusable delay and that the delay gives rise to serious prejudice or substantial risk of unfair resolution of disputes.

21. Inordinate delay means a delay that is significantly longer than what would normally be regarded as acceptable and it will depend upon the facts of each case. The overall picture in this arbitration, however, clearly is not one of a claimant (headowner) who has abandoned its claim. The correspondence has not been desultory, or one-sided: to the contrary, headowner, BDN and Tradeline have actively participated in substantial on-going correspondence and meetings through their representatives in an effort (regrettably unsuccessful to date) to amicably resolve the disputes. Moreover, headowner has further made clear that it has completed its Points of Claim and is prepared to file them if an amicable resolution cannot be reached. (Ex. F).

22. As noted above, apart from showing that the delay has been "inordinate," a respondent seeking to have a claim in arbitration struck out for inexcusable delay must also show that the claimant has caused prejudice by creating a risk or potential risk that it will not be possible to have a fair trial of the issues.

23. Tradeline submits on pages 7 and 8 of the Memorandum of Law, Somnath Declaration ¶ 16 and Habergham Declaration ¶ 10, that the "staleness" of the claim prejudices Tradeline because the factual circumstances of the case may no longer be investigated, witnesses may be difficult to locate, and documents and other evidence (such as load port samples and/or the damaged corn) may by now be lost. This is not, however, a valid argument. In the first place, Tradeline has been on notice of the headowner's and BDN's claims since 2001, and the factual circumstances of the case could have been investigated by Tradeline at that time. Indeed, as charterers of the vessel and, presumably, sellers of the cargo to the receivers who rejected the cargo, Tradeline surely was on virtually immediate notice that the cargo had been rejected and the vessel arrested by the receivers until

security was provided. Moreover, formal notice and details of the headowner's cargo claim were given in March and September 2003, so that investigations could have been carried out at that time.

24. Contrary to Tradeline's suggestion, contemporary evidence in the form of survey reports and certificates has been in their possession for quite some time, and they have failed to identify any specific "witnesses to the events giving rise to the claim" whose evidence they have lost as a result of the passage of time (Br. 7). Moreover, it is well known that, in a country such as Iran, both in 2001 and at any later date, there will always be major difficulties in finding witnesses who are prepared to co-operate and provide written statements for use in London proceedings. It is not unusual for cargo claims in London arbitrations to be determined on the basis of whatever contemporary evidence is available coupled with reports and opinions of marine cargo surveyors who are qualified to review the evidence and opine on the likely cause of the damage and who are available to be cross examined by the parties and the tribunal, if necessary. In particular, the unavailability of cargo samples at loading or the damaged cargo at discharge would not, in itself, be sufficient prejudice to show that a fair resolution of the dispute is not possible.

25. In any event, all of Tradeline's complaints as to the sufficiency of the evidence and the alleged delay are legal arguments which, pursuant to the Subcharter, are subject to English law and arbitration. Put another way, they are defences on the merits which Tradeline is obviously free to advance in opposition to the claims by BDN in that arbitration, but they are not issues which should be litigated before this Court.

26. Tradeline's contention that BDN has not previously requested or otherwise sought security is incorrect. Indeed, the undersigned specifically requested

in my 13th November 2001 letter, (Ex. D), that Tradeline agree to secure the claims by BDN. Needless to say, no response was ever received to this request.

27. Between 2001 and the present BDN has, in fact, explored various means of obtaining security from Tradeline. While I cannot, for obvious reasons, discuss any specifics given that efforts are on-going, I can say that we have thus far been unsuccessful in obtaining any security from Tradeline save for what has been attached in these proceedings.

28. Mr. Somnath asserts in his declaration at paragraphs 10-12 that Tradeline is a "hugely solvent company" which stands "fully ready, willing and able to pay any sums awarded to Plaintiff ...." I note, however, that according to Tradeline's own financial statement it earned a net profit in 2005 of merely US$ 1,719,756.06. This is to be contrasted with the claim in the present case, which is for US$ 2,653,524.23, *i.e.*, nearly a million dollars more than Tradeline's entire net profit for last year, and well over twice Tradeline's cash and bank balance as of 2005.

29. Additionally, I understand that there is currently another action pending in the Southern District of New York against Tradeline by a company called Essco Faith (06-cv-01851), and that the claim stated in that complaint is for US $3,913,000, or well over twice Tradeline's entire net profit for 2005. Moreover, I understand that Essco Faith has itself attached virtually all the same funds attached by BDN in this action (*i.e.*, totalling US $764,375.31), which by Tradeline's own documents represents a restraint of funds equivalent to nearly one-half of its net profits from all of last year.

30. Furthermore, although Tradeline claims that it has "net assets" of approximately US$16 million, virtually all of that takes the form of "accounts receivable," which are extremely intangible. (See Somnath Dec.,

Ex. A p. 2). Tradeline are not the registered owners of any vessels and, while I understand they charter in a number of ships, the opportunities to arrest time-chartered vessels are strictly limited. Because Tradeline is formed under the laws of, and has its principal offices located in, the United Arab Emirates, the possibilities of enforcing an arbitration award against any assets it may have are, in my experience, very remote. In particular, it is my understanding, as confirmed by the UNCITRAL Secretariat in Vienna, Austria that while the UAE has completed internal requirements to become a party to the 1958 New York Convention, it will only become binding when the Instrument of Accession is lodged with the treaty section of the United Nations. This has not yet happened and pending full accession, it would not be possible to enforce an arbitration award against a company in the United Arab Emirates if that company fails to pay on a voluntary basis.

31. Accordingly, because of the thin capitalization of Tradeline, the nature and location of what assets it may in fact possess, the very substantial (known) claims against Tradeline, the prior restraint by Essco Faith of substantial funds belonging to Tradeline, and the minimal opportunity to enforce an arbitration award against Tradeline in the one jurisdiction where it may actually have assets which would be available to satisfy an award (*i.e.*, the UAE), BDN's efforts to obtain adequate security in New York are both reasonable and entirely justified.

32. In the circumstances I submit that Tradeline's application to vacate the attachment should be denied.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: London, England

July 31, 2006

By: /s/ Kathryn Whelan
Kathryn Whelan