UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BOTTIGLIERI DI NAVIGAZIONE SPA,

                Plaintiff,

against

TRADELINE LLC,

                Defendant.

06 CIV 3705 (LAK)

HABERGAM DECLARATION IN SUPPORT OF MOTION TO VACATE ATTACHMENT

---

JOHN HABERGHAM, pursuant to Title 28, §1746 of the United States Code, hereby declares and says the following under penalty of perjury:

1    I am the same John Habergham who signed a declaration in this matter dated 26 June 2006. I make this second declaration to answer some of the contentions raised by the Plaintiff through the declarations of Kathryn Whelan and Benjamin Oldborne.

2    In so far as the contents of this declaration are within my own knowledge, they are true. In so far as the contents of this declaration are not within my own direct knowledge, they are true to the best of my information and belief.

3    Mr Oldborne, in paragraphs 10 – 12 refers to the judgment of Mr Justice Neill in the "CAROLINE P".

4    In particular, I draw attention to Mr Oldborne's paragraph 12 where he stated that Neill J stated that the head owners right to recover <u>could</u> have been formulated as a breach of an implied term of a charter party but, in that case, was unable to come to such a finding because of the way the case had been argued before him. For the reasons I give below, I reaffirm paragraph 12 of my first declaration, that the BDN claim is in the nature of an implied indemnity as per the decision of the court in the

"CAROLINE P" and is, therefore, premature. Mr Oldborne's reliance upon the case corroborates my opinion.

5   In the circumstances, one has to look at how the claim has been presented, such as it has, by BDN to Tradeline.

6   In the declaration dated 31 July 2006 made by Kathryn Whelan, she exhibits various documents which are said to provide evidence of the formulation and nature of BDN's claim against Tradeline. The first, at exhibit C, is simply a claim for balance of a final freight account. The second, at exhibit D, expands upon that only a little by adding an additional claim for detention. The letter exhibited at E, from solicitors representing the head owners, to Kathryn Whelan adds nothing further by way of a head of claim.

7   The next item is contained at exhibit G which, in turn, is a reference to the letter from the head owners solicitors at exhibit F. However, that letter (G) simply ends with a reference to the fact that BDN will "serve back to back submissions on the sub-charterers.....". There is no further comment made by Kathryn Whelan as to the nature of BDN's claim against Tradeline in response to the updated letter of claim from the head owners solicitors dated 31st March 2006 and which is exhibited at I to Kathryn Whelan's declaration, and which sets out the revised nature of head owners claim against BDN. I should point out the claim for breach of contract which was premised in exhibit F (see the letter from head owner's solicitors dated 12th September 2003) was based upon an argument that there had been a pre-shipment treatment of this cargo thereby making it susceptible to heating which started a started a cycle which lead to development of mould  That argument is no longer being pursued. With respect, BDN's stance seems to be one based on shifting sands and has the appearance of cloaking the nature of the claim to make it something that it is not.

8   The way BDN put their case is that they are going to pursue "back to back" submissions without condescending to any further particularity. This has all the

hallmarks of a claim for an indemnity as envisaged in lettered paragraphs (b) and (c) of page 475 of the judgment of Neill J in the "CAROLINE P" (exhibit C of Mr Oldborne's declaration). The indemnity which is implied would indemnify the disponent owners from the consequences of following the charterers orders to load this consignment of maize. It is more in the nature of the general meaning of the word "indemnity" whereby the promisor agrees to save the promisee harmless from the loss caused by claims of third parties. In short – whatever liability they are fixed with, as a generality, BDN will seek to pass on to Tradeline.

9  I return to one further point raised by Mr Oldborne and that his approach contained in paragraph 28 in which he examines the matter from the point of view of limitation. Whether that is a relevant factor I leave to this Honourable Court. However, I simply point out that the "strange result" referred to by Mr Oldborne in paragraph 20, when he comments upon a decision of the court in the "CATHERINE HELEN" is not without precedent in the courts of England and Wales.

10 Attached at exhibit A is a decision of the Court of Appeal in the "JULIUS HAMMER".

11 In that case, the defendant was a bunker supplier who had supplied bunkers to a vessel in February 1995. It was supplied pursuant to a string or chain of parties. The claimant, the vessel owner, paid the defendant in March 1995.

12 A little over a year later, the claimant's vessel was arrested by the physical supplier of the bunkers who claimed they had not been paid in other words payment had not flowed down the chain. The vessel was released by payment of a substantial bond by way of security. The claimant brought a claim against the defendant based upon the statutory implied terms in section 12 of the Sale of Goods Act 1979 i.e that the buyer would be entitled to quiet possession and, secondly, the implied term that the goods were free of a charge or incumbrance at the time when property passed. The defendant's defence, which was the subject of a preliminary issue, was that a six month contractual time bar in their standard terms extinguished liability.

13 The Court of Appeal, at paragraph 33, page 451, when referring to the claimant's

counsel's submissions, said:

> "He submitted, secondly, that the central feature of the present case is that the relevant claim arise after the six month period had expired. It follows that if clause 10 has the effect for which the respondents contend, then the claim effectively is still born because no proceedings can be taken in respect of it"

14  The Court of Appeal upheld the first instance judge, in this respect, who had extolled the benefits of certainty and finality contained in the six month time bar. But the important conclusion to be drawn from this decision is that the Court of Appeal was content that, whilst there may be some unfairness in a claim which may be stillborn at birth, it would nonetheless be prepared to uphold it. To this extent, it didn't think that this would be a "strange result".

15  I turn now to the declaration of Kathryn Whelan and, in particular, paragraph 19. A claim can be struck out, under English law, for delay in failing to prosecute. The fact is that the cases relied upon by BDN dealt with the interpretation of the Rules of the Supreme Court 1965. The case relied upon by BDN, in Katheryn Whelan's paragraph 19, Lazenby v McNicolas, similarly, indirectly, is based upon litigation under the old court rules. However, in 1999, the Rules of the Supreme Court were swept away with the introduction of the Civil Procedure Rules 1998. The impetus behind the introduction of CPR was to take the timetable of the case away from the parties and into the court's hands. As a result, the case management powers of the court have become substantially greater and there is a need for adherence to strict time limits. The court has been given teeth by, amongst other things, a specific rule, rule 3.4, which confers the court the power to strike out a case if there has been a failure to comply with the rule, practice direction, court order. In general, the nature of CPR is such that the case is unlikely to reach the position where a striking out under the old RSC may be necessary. Arbitrators are at liberty to adopt a similar

approach. I point out, at this stage, that, by their own admission, Tradeline was not notified of the cargo damage claim until 2½ years after the completion of the loading/discharge operations. See paragraph 10 of my earlier declaration.

16   As a general point, with regard to paragraph 19 of Kathryn Whelan's declaration, I am not, in any event, sure of the relevance of all this. I suspect it is a bit of a smoke screen, a bit of a red herring. The reason I say this is that I am not sure why the approach to be taken by a New York court should be based upon English procedural law considering a strike out due to inordinate or inexcusable delay. As a final point, on paragraph 19, I think that Kathryn Whelan has it slightly wrong when she says that a claim will not be struck out for delay within the limitation period of 6 years because it can simply be recommenced. That may be applicable to litigation, but not necessarily to the arbitral process.

17   I turn now to paragraph 14 of Kathryn Whelan's declaration. As I have said, above, in September 2003, the basis of the head owners claim, which amounted to a substantial proportion of the claim, was based on an argument that there had been pre-shipment treatment of the cargo of maize which made it susceptible to the development of mould. That has now been dropped. That brings me on to her paragraph 23 where she says that Tradeline could/should have been making enquiries and gathering evidence because, I assume she is saying, they knew the nature of the case that they had to face. However, that is simply not true.

18   As I have said above, the claim based on pre-shipment treatment has been dropped. The claim is now based squarely on the fact that the cargo was over-moist and, therefore, an unreasonable/dangerous cargo. But that argument only became apparent after BDN and Tradeline had instructed CWA. CWA's initial view was that if the cargo had been over-moist, why did it not affect the other holds to the same extent and degree that it did at numbers 1 and 6, and which form the basis of this claim. CWA's report is dated June 2005.

19   In November 2005, there was a meeting of the experts and one of the items upon

which they had to disagree was a factual scenario at the load port in Argentina. The head owners had asserted that there was not a common source of the maize and, therefore, CWA's fundamental argument went by the by. So, this is in November 2005 when this factual issue arises and from that point, I have been trying to find out from Tradeline whether evidence is available to counter what the head owners say or otherwise. I am seeking to find out whether any samples were kept or whether any records were kept of moisture content, source of this consignment, and so on and so forth. This is the prejudice that I am talking about and it only arose at the back end of last year.

20  As to paragraph 24 of Kathryn Whelan's declaration, it is not Iran which is now important but, rather, Argentina. I am not sure whether the same can be said about Argentina as Kathryn Whelan seems happy to say about Iran.

21  I declare under penalty of perjury of laws of the United States of America that the a foregoing is true and correct.


Dated: Hull, England
       14 August 2006

By:................................................

John Habergham

**EXHIBIT A**

[2000] 1 Lloyd's Rep. 446
1999 WL 1142725 (CA (Civ Div)), [2000] 1 Lloyd's Rep. 446, [2000] 1 All E.R. (Comm) 519
(Cite as: [2000] 1 Lloyd's Rep. 446)

Page 1

*446 Ocean Chemical Transport Inc. and Another
v. Exnor Craggs Ltd.

Court of Appeal

CA
Dec. 15, 1999

Before Lord Justice Evans, Lord Justice Henry and Lord Justice Waller

Contract - Construction - Limitation of time - Contract for supply of bunkers - Claimants alleged breach of implied term of quiet enjoyment - Whether claim time barred - Whether time bar clause incorporated in sale contract - Whether Unfair Contract Terms Act, 1977 precluded defendants from relying on time bar.

By an exchange of faxes on Feb. 7, 1995 the claimants, a United States company which owned a number of ships, entered into a contract with the defendants, an English company for the supply of bunkers. The contract was broked by a United Kingdom company. Certain details were set out in the fax including the fact that "the terms and conditions of this sale. . .are subject to the seller's [defendants'] general terms and conditions". One of the terms, cl. 10, provided inter alia:

All liability whatsoever on our part shall cease unless suit is brought within six months after delivery of the goods or the date when the goods should have been delivered.

The bunkers were supplied to a vessel *Julius Hammer* at Suez on Feb. 22, 1995. On Mar. 24, 1995 the claimant paid the defendants for them and pursuant to the contractual terms title in the fuel passed to the claimants then if not before.

In July, 1996 the claimants' vessel was arrested in Egypt by the company which had supplied the bunkers allegedly claiming that they had not been paid for the bunkers in question by whoever had placed the order with them.

The vessel was released from arrest on payment of a substantial sum by way of security bond for U.S.$227,528.38.

The claimants brought a damages claim against the defendants for breach of contract. The claimants relied on the statutory implied terms in s. 12 of the Sale of Goods Act, 1979. Section 12(2) provided inter alia:

(b) the buyer will enjoy quiet possession of the goods . . .

Section 12(2)(a) provided for a further term to the effect that the goods were free from a charge or encumbrance at the time when the property passed. The claimants alleged breaches of both those terms.

The defendants denied liability alleging in par. 10 of their amended points of defence that the claim was time barred in that the defendants' general terms and conditions were incorporated into the contract or agreement and cl. 10 provided that all liability on the defendants' part was to cease unless suit was brought within six months after a delivery of the goods; the fuel was delivered on Feb. 25, 1995 but the action was commenced on July 25, 1996.

On Nov. 6, 1998 Mr. Justice Rix ordered a preliminary issue to be tried. The issue was whether or not the claim was time barred as alleged in par. 10 of the amended points of defence. That issue gave rise to three sub-issues which were:
   (1) If the time bar was incorporated in the contract of sale, does it serve to extinguish any liability which the defendants may otherwise owe?
   (2) Was the time bar incorporated into the contract of sale?
   (3) If the time bar would serve to extinguish liability and was incorporated, was the contract of sale subject to the Unfair Contract Terms Act, 1977 (UCTA) whereby the claimants are precluded from relying on such time bar?

Held, by Judge HALLGARTEN, Q.C. that
   (1) as to construction no reason was put forward for derogating from the plain meaning of the time bar clause; and there was no requirement to give the clause a strained construction so as to reallocate risk in circumstances which would only arise with relative rarity;
   (2) there was an express reference to the terms and conditions in the contractual documents; cl. 10 could not be regarded as either onerous or unusual and the defendants were entitled to invoke the time bar;
   (3) it was not in dispute that if the Unfair Contract Terms Act applied, the effect of s. 6(1) would be to override cl. 10 in relation to claims arising under s. 12 of the Sale of Goods Act, 1979; the present case was not within s. 26(3)(b); although UCTA was not altogether sufficiently clear, "party" in s. 26(3)(b) meant "party to the contract" i.e. someone who accepted liability as

[2000] 1 Lloyd's Rep. 446
1999 WL 1142725 (CA (Civ Div)), [2000] 1 Lloyd's Rep. 446, [2000] 1 All E.R. (Comm) 519
(Cite as: [2000] 1 Lloyd's Rep. 446)

Page 2

principal; and the relevant place of business for the party in question was the true place of business of that party and not the place of business of the agents through whom the contract happened to be made.

The claimants appealed.

Held, by C.A. (EVANS, HENRY and WALLER, L.JJ.), that

(1) the proper approach to construing cl. 10 was that which was adopted when an exceptions or exclusion clause was under consideration; the proper approach to interpretation would take account both of the kind of clause it was and the nature and extent of any rights which it purported to take away from the opposing party or to modify; the more stringent approach in relation to exceptions clauses would be adopted (see p. 452, cols. 1 and 2);

(2) the learned Judge was entirely right to reject the submissions with regard to the application of the Unfair Contract Terms Act, 1977; it was as clear as could be that the reference in s. 26(3)(b) to a contract which was "made by the parties" and then referred to the places of business of the parties was referring to the principals to the contract in question and not to the agents through whom the contract might have been made (see p. 453, cols. 1 and 2);

*447 (3) the question of incorporation always depended on the meaning and effect of the clause in question; cl. 10 was a clause which had the effect of a time bar clause which excluded liability after a certain period had passed; given the nature of this term and condition and its effect as relied on by the defendants, it could not be said that the defendants failed in their duty to bring the existence of that term to the notice of the claimants; in this case, where there was an express acknowledgment of the existence of the terms, the defendants certainly discharged their duty of bringing it sufficiently to the notice of the claimants for the clause to form part of the contract; and there was no evidence which supported the proposition that this clause was in any way extreme or totally unexpected to be found in a contract such as this (see p. 453, col. 2; p. 454, col. 1);

(4) the clause on the defendants' construction prevented the claimants from bringing a suit which could not be brought during the six-month period simply because the breach occurred after that period ended; that situation did not lead to an inference that the parties would have given the clause a more limited meaning if they had contemplated this unusual situation arising sometime in the future; the evidence showed that the risk of circumstances such as this arising was so small that one could accept that they were almost certainly not present in the minds of the parties, nor would they have been in the minds of persons placed as the parties were; the claimants would not have been aware of any significant commercial disadvantage to themselves by agreeing to accept this small risk; the Judge was right to find as he did on issues 1 and 2 and the appeal would be dismissed (see p. 454, col. 2).

The following cases were referred to in the judgment of Lord Justice Evans:

AEG (U.K.) Ltd. v. Logic Resource Ltd., [1996] C.L.C. 265;

Ailsa Craig Fishing Co. Ltd. v. Malvern Fishing Co. Ltd, (H.L.) [1983] 1 Lloyd's Rep. 183;

Atlantic Shipping and Trading Co. Ltd. v. Louis Dreyfus & Co., (H.L.) (1922) 10 Ll.L.Rep. 707; [1922] 2 A.C. 250;

BHP Petroleum Ltd. v. British Steel Plc, [1999] 2 Lloyd's Rep. 583;

Evje, The (H.L.) [1974] 2 Lloyd's Rep. 57;

Himmerland, The [1965] 2 Lloyd's Rep. 353;

Interfoto Pictures Library Ltd. v. Stiletto Visual Programmes Ltd., [1989] 1 Q.B. 433;

Laceys Footwear (Wholesale) Ltd. v. Bowler International Freight Ltd., [1997] 2 Lloyd's Rep. 369;

Thornton v. Shoe Lane Parking Ltd., [1971] 2 Q.B. 163.

This was an appeal by the claimants Ocean Chemical Transport Inc. and Ocean Ships Inc. from the judgment of His Honour Judge Hailgarten, Q.C. given in favour of the defendants Exnor Craggs Ltd. and holding in effect that the plaintiffs' claim against the defendants for damages for breach of contract was time barred.

Representation

Mr. Graham Charkham (instructed by Messrs. More Fisher Brown) for the claimants; Mr. M. Davey (instructed by Messrs. Andrew M. Jackson & Co., Hull) for the defendant.

The further facts are stated in the judgment of Lord Justice Evans.

JUDGMENT

Lord Justice EVANS:

(1) This is an appeal from a judgment given by His Honour Judge Hallgarten, Q.C. in the Commercial Court on July 26, 1999. He decided three preliminary issues, which had been ordered to be tried by Mr. Justice Rix on Nov. 6, 1998.

2. The issue as ordered was "whether or not the claim is time barred as alleged in paragraph 10 of the amended points of defence served 21st April 1998". As the learned Judge indicated, the issue gave rise to three sub-issues, which he defined as follows:
1. If the time bar was incorporated in the contract of sale, does it serve to extinguish any liability which the defendants may otherwise owe?
2. Was the time bar in fact incorporated into the contract of sale?
3. If the time bar would serve to extinguish liability, and was incorporated, was the contract of sale subject to the Unfair Contract Terms Act 1977 ("UCTA"), whereby the claimants are precluded from relying on such time bar?

3. The three issues all arose out of par. 10 of the defence, which alleged:
In any event, the Plaintiff's claims are time barred as follows:
(i) [as amended] The Defendants' General Terms and Conditions were incorporated into the contract or, in the alternative, the Agreement.
(ii) Section 10 of such Terms and Conditions provided inter alia as follows:
. . .All liability whatsoever on [the defendants'] part shall cease unless suit is brought within six months after a delivery of the goods . . .

(iii) The goods (. . .The Fuels) were delivered on or about the 22nd February 1995.

(iv) The action herein was commenced on 25th July 1996.

*448 In reliance on the aforesaid Section 10, the Defendants deny liability.

4. The contract was for the supply of bunkers, the claimants being a United States company which owned or operated a number of ships. They arranged for bunker liftings through a United States brokerage company, Bunkerfuels Corporation of Cranbury, New Jersey. In the present case the sale was broked by the United Kingdom company, Bunkerfuels U.K. Ltd. The person concerned at Bunkerfuels U.K. was a Mr. Jack Varela. He arranged a purchase from the respondent, Exnor Craggs Ltd., who were represented by Mr. Mark Paul. The respondents are an English company which is based in Grimsby.

5. The bunkers were supplied to a vessel, *Julius Hammer*, at Suez on Feb. 22, 1995. On Mar. 24, 1995 the appellants paid the respondents for them. Pursuant to the contractual terms, title in the fuel passed to the appellants then if not before.

6. It was not until July, 1996 (that is to say, some 17 months later) that the claimants' vessel was arrested in Egypt by the company which had supplied the bunkers. That was a company called Societe Cooperative des Petroles. When the vessel was arrested by those suppliers, it was apparently because the suppliers were claiming that they had not been paid for the bunkers in question by whoever had placed the order with them.

7. Little is known about the exact basis of the suppliers' claim. The points of claim read as follows:
9. The Supplier has commenced legal proceedings in Egypt against the Vessel and/or her Owners and/or Disponent Owners and/or Managing Owners and/or Master and/or Charterers alleging that it has not received payment as aforesaid . . .

8. The reference to "as aforesaid" is a little unclear. There is no allegation in the pleading of any contract between the suppliers and any other party.

9. The vessel was released from arrest upon payment of a substantial sum by way of security bond for U.S.$227,528.38 and it is that which forms the basis of the damages claim which the appellants now bring against the respondents from whom they contracted to buy the bunkers in question.

10. The claim is that the arrest came about because of a breach of contract by the respondents. The claimants rely upon the statutory implied terms in s. 12 of the Sale of Goods Act, 1979. Section 12(1) contains the term to the effect that the seller has a right to sell the goods. That may be sufficiently called the undertaking as to title. In s. 12(2) there is specified a further implied term:
(b) the buyer will enjoy quiet possession of the goods except so far as it may be disturbed by the owner or other person entitled to the benefit of any charge or encumbrance so disclosed or known.

11. Section 12(2)(a) provides for a further term to the effect that the goods were free from a charge or encumbrance at the time when the property passed.

12. The claimants allege breaches of both those

terms. The allegations necessarily are in general terms because of the paucity of information regarding the precise nature of the proceedings which have been brought in Egypt. Broadly, however, Mr. Charkham submits that there are grounds for alleging at least two breaches of contract. First, that there was some defect in the title to the goods which has resulted in the later arrest of the ship. The significance of that alleged breach is that it occurred, if at all, at the time when the bunkers were delivered in February, 1995. Secondly, there was, he says, a breach of the term as to quiet enjoyment (that is s. 12(2)(b)), the importance of that allegation being that the breach occurred only in July, 1996 when the vessel was arrested. For that reason Counsel has emphasized the alleged breach of the provision as to quiet possession rather than the further allegation of a breach of the term as to title.

13. It must be observed that the basis of the claim made in Egypt is not at all clear. The likelihood would seem to be that the bunkers in question were consumed by the vessel long before July, 1996. There may well be room for considerable debate as to whether any residues of those bunkers remained in the vessel in July, 1996. It may also be observed that any such debate would seem, on the face of it, to be highly artificial and likely to be unproductive. However, we must assume for present purposes that a ground or grounds for claiming damages from the defendants by reason of the subsequent arrest of the vessel may be made out.

14. The circumstances in which the contract was made were set out by the learned Judge at pp. 10-12 of his judgment. This account and these findings are not challenged by Mr. Charkham on this appeal and they can therefore be accepted as follows:

In consequence Mr Earnest Janssen of BUSA [the United States brokers] telephoned Mr Varela instructing him that BUK were to place the stem with the defendants. Mr Varela accordingly telephoned his counterparty at the defendants, Mr Mark Paul, and, agreement having been reached between them, Mr Varela sent the following to the defendants at 17.04 on 7th February 1995 addressed to "Buyer and Seller":
*449 In accordance with instructions received from Ocean Ships Inc we confirm placing following nomination.
Certain details were set out and the fax continued:
The above details are the basis of the contract between buyer and seller which is governed by sellers terms and conditions of sale. Bunkerfuels UK Ltd is acting as brokers only.

About half an hour later, at 17.34 Mr. Paul sent to BUK a fax in slightly different terms which it is common ground contained or evidenced the contract. That fax identified the purchaser in somewhat wider terms, amplified the details, eg as to payment terms, and concluded:
This nomination has been placed in accordance with our general terms and conditions of sale and delivery (copy available upon request).

This fax was copied by BUK to BUSA but it is not clear whether BUSA passed it to the second claimants. They did, however, provide what might be called a resume which included the following provision:
The terms and conditions of this sale, unless otherwise stipulated, are subject to the seller's general terms and conditions. Particular attention should be given to clauses concerning cancellation (which generally require a force majeure situation) and the price validity period. If the buyer is not in possession of same and wishes a copy, a written notice must be sent to Bunkerfuels Corporation, by facsimile or telex, within 24 hours of the date and time this confirmation is sent.

The resume concluded:
We will assume that all parties agree to this confirmation unless we are notified in writing within 24 hours of the date and time that this message is sent.

There is no evidence that the fax was sent otherwise than to the claimants.

The above narrative is sufficient to show that the contract purported to incorporate the defendants' general terms and conditions.

15. The terms and conditions in question are included in the bundles before us in two forms. The first is printed on a total of seven pages. It was in that form that the terms had, some time prior to the making of the contract, been supplied by the respondents to the United Kingdom brokers. We also have them in another form where they appear on four pages, each bearing two columns in rather smaller print.

16. The relevant term is the last, cl. 10, which is headed "Disputes" and which I should read in full:
The agreement entered into with the Buyer shall be governed by the laws of the United Kingdom. The applicability of the Uniform Sales Act is expressly excluded. All disputes arising or resulting from or touching our agreement with the Buyer shall be referred exclusively to the determination of the competent Court at London, unless we should decide to apply to another Court or we should submit to the determination and judgment of such

other court of law. All liability whatsoever on our part shall cease unless suit is brought within six months after delivery of the goods or the date when the goods should have been delivered.

17. Perusal of the earlier terms, cll. 1-9, show that there was detailed provision for the incidents of a contract such as this. There are, in particular, stringent time limits for what are described generally as matters relating to "measurements, quantity and quality" in cl. 3. It would seem that these reflect the nature of a contract such as this. In short, disputes as to quantity or quality have to be determined within a very short time after delivery. Clause 3/10 requires immediate notice and formal notice of claim within 10 days after delivery. There are further provisions regarding the passing of ownership in particular in cl. 5.6 and cl. 7. Those are directly relevant, of course, to the assertion that there was a breach of the term as to title in the present case.

18. Mr. Charkham's submission with regard to the layout of the general terms and conditions is that no prominence whatever is given to what is for present purposes the relevant sentence; that is, the six-month time bar contained in the very last sentence of the last clause, which is cl. 10. Factually, that submission is entirely correct. We have not been troubled with consideration of the details of any of the other clauses. Mr. Charkham submits that in so far as there are stringent requirements and time limits, for example with regard to quantity and quality, those are matters which the buyer of bunkers in circumstances such as this would naturally expect to find. Therefore, he submits, no prominence need be given to them. It is otherwise, he submits, when there is a general time limit of the kind which is relied on in the present case. There was evidence that the terms in question had been in use by the respondents from about the mid 1980s.

19. The evidence before the Judge included that of Mr. Paul. Paragraph 11 of his witness statement reads:

The reason why the 6 months time bar was implemented in Section 10 of the terms and*450 conditions is as follows. Claims usually relate to quantity or quality of the fuel supplied, or non-payment of the price. The terms and conditions give a detailed procedure should there be a dispute as to quantity and quality. It is usually apparent from the outset, when supply takes place if there has been a short delivery. Disputes as to quality are usually discovered within a matter of days when the vessel starts to use the fuel. It is for this reason that, pursuant to Section 3.10 we require notification within 10 days of any claim. This is a more than reasonable period to allow a party because, as I have said, disputes are usually apparent by this stage. The terms and conditions ensure that we retain samples taken at delivery for a period of up to 2 months. I understand that some suppliers may keep samples for up to a period of 6 months but generally no longer. This is considered more than sufficient as a dispute on quality is usually apparent by that stage. Usually Exnor Craggs Ltd give credit of 30 days. This is the industry norm. I have known instances of credit periods being granted of 45 days and, rarely, 60 days but this is the maximum. Therefore, 6 months usually gives ample time for a potential dispute to have crystallised.

20. Much evidence was placed before the Judge on what was essentially a construction issue and the learned Judge made a number of findings. He did so in the context of the second issue, that is to say under the heading "Incorporation". He had been referred to a great number of other forms used by suppliers of bunkers and had even heard expert evidence, presumably as to the practices in this particular trade. Among the issues which he decided, as I shall indicate shortly, were the questions whether the clause and its terms should properly be regarded as either onerous or unusual.

21. He made some detailed findings at p. 18 of his judgment as to the general picture which was created as a result of what he called "a diligent trawl of no fewer than 60 different standard terms of sale proffered by bunker suppliers or dealers". He stated his conclusions under four headings. They included par. 4:

In about a third of forms (say about 20) there were limitations along the lines set out under sub-head 3 above [that is to say time limits] in relation to *any* claim. As to notice provisions, these varied from one to 45 days; as to the time to start proceedings the periods varied from one month to one year. Of these provisions the vast majority were not the mutual clauses (cf the *Himmerland* [that was a judgment reported at [1965] 2 Lloyd's Rep. 353, to which he had referred earlier] but operated only in favour of the sellers.

22. Those findings are criticized by Mr. Charkham in his submissions on this appeal.

23. The learned Judge decided all three issues in favour of the respondents. His conclusions were stated as follows. First, with regard to construction, which he described as the "pure construction argument" he held that there was no reason put forward for derogating from the plain meaning of the clause.

By contrast, . .Mr Davey [Counsel for the respondents] was able to advance and extol the benefits of certainty and finality. Upon expiry of

[2000] 1 Lloyd's Rep. 446
1999 WL 1142725 (CA (Civ Div)), [2000] 1 Lloyd's Rep. 446, [2000] 1 All E.R. (Comm) 519
(Cite as: [2000] 1 Lloyd's Rep. 446)

Page 6

six months the defendants would know where they were and would, if they wished, be able to treat any transaction as history. True, there might be claims which only surfaced after the expiry of six months, but a period of six months is not itself an unreasonable period of limitation, either in the context of commercial transactions generally or bunker transactions in particular.

24. He went on to say that there was no requirement to give the clause a strained construction so as to reallocate risk in circumstances which would only arise, as he said "with relative rarity" - that is to say, when the claim surfaces as late as this one did. In support of his conclusions on construction, he referred to the judgments of the House of Lords in The Evje, [1974] 2 Lloyd's Rep. 57 and *The Himmerland*, to which I have already referred. The latter judgment was concerned, of course, with the well known Centrocon clause which frequently appears or appeared in charter parties with well known short time limits within which proceedings have to be commenced.

25. Secondly, with regard to the incorporation issue, the learned Judge made the findings of fact which I have already quoted and he later referred to the extrinsic evidence, which he summarized. He explained that it was not disputed but that the terms and conditions were incorporated as a document. The contention was that:

. . .if. . .the time-bar would serve to defeat the claim in this case, it was solely that provision of the terms and conditions which was not incorporated.

26. He then recited Mr. Charkham's reliance upon the principle of construction which is exemplified in the following authorities in particular - Thornton v. Shoe Lane Parking Ltd., [1971] 2 Q.B. 163, Interfoto Pictures Library Ltd. v. Stiletto Visual Programmes Ltd., [1989] 1 Q.B. 433, AEG (U.K.) Ltd. v. Logic Resource Ltd., [1996] C.L.C. 265 and Laceys Footwear (Wholesale) Ltd. v. Bowler International Freight Ltd., [1997] 2 Lloyd's Rep. 369. That principle is summarized in the 28th ed. of Chitty on Contracts in par. 12/015 as follows:

*451 Onerous or unusual terms. Although the party receiving the document knows it contains conditions, if the particular condition relied on is one which is a particularly onerous or unusual term, or is one which involves the abrogation of a right given by statute, the party tendering the document must show that it has been brought anything fairly and reasonably to the other's attention. "Some clauses which I have seen," said Denning LJ, "would need to be printed in red ink on the face of the document with a red hand pointing to it before the notice could be held to be sufficient."

27. The learned Judge held, first, that that principle had no application in the present case where, unlike the cited authorities, there was an express reference to the terms and conditions in question in the contractual documents themselves. Moreover, it was a reference first made by the brokers who, on any view, were acting, whether exclusively or not, as agents for the buyers. Secondly, however, he proceeded to consider whether, if that was wrong, the present clause, cl. 10, should be regarded as either onerous or unusual for the purposes of this rule of construction. He found, partly on the evidence before him and partly, clearly, from his own knowledge of these matters, that neither adjective could properly be applied to a clause such as this. He concluded:

In those circumstances, even had I held that in this case the right approach to the question of incorporation was that set out in the Interfoto case, I would still have concluded that the defendants were entitled to invoke the time-bar.

28. Thirdly and finally, with regard to the third sub-issue, the Judge recorded that it was not in dispute that if the Unfair Contract Terms Act applied in the present case, then the effect of s. 6(1) would be to override cl. 10 in relation to claims arising under s. 12 of the Sale of Goods Act. The issue before him arose under s. 26 of the Unfair Contract Terms Act, which reads as follows:

26. International supply contracts.

(1) The limits imposed by this Act on the extent to which a person may exclude or restrict liability by reference to a contract term do not apply to liability arising under such a contract as is described in sub-section (3) below . . .

(3) Subject to sub-section (4), that description of contract is one whose characteristics are the following -

(a) either it is a contract of sale of goods or it is one under or in pursuance of which the possession or ownership of goods passes; and

(b) it is made by parties whose places of business (or, if they have none, habitual residences) are in the territories of different States . . .

29. As Mr. Charkham pointed out, those two requirements of an exceptional case are cumulative. There are further requirements in sub-s. (4) which are disjunctive but which are not relevant in the present case.

30. The learned Judge rejected submissions that the present case was within the wording of s. 26(3)(b). The submission was that the reference to the words "it is made by parties whose places of

[2000] 1 Lloyd's Rep. 446
1999 WL 1142725 (CA (Civ Div)), [2000] 1 Lloyd's Rep. 446, [2000] 1 All E.R. (Comm) 519
(Cite as: [2000] 1 Lloyd's Rep. 446)

Page 7

business are in the territories of different states" was satisfied here because the contract was in fact made in London by the brokers and therefore the fact that the sellers and the buyers had their places of business in the territories of different states (that is to say, the United States of America and the United Kingdom) was not material. The learned Judge rejected that argument and held:

. . .although UCTA is not altogether clear and suffers from shifts of language, it seems to me that "party" means "party to the contract", ie someone who accepts liability as a principal. Its meaning is in my view reinforced by section 27(2)(b) which touches on contracts concluded by an agent - albeit what that subsection deals with are contracts with a party who is a consumer.

31. Then the learned Judge held that the relevant place of business for the party in question was the true place of business of that party, and not the place of business of the agents through whom the contract happened to be made.

32. Mr. Charkham, to whose submissions I would pay tribute for their care and for the clarity with which they were presented to us, both in writing and orally, has submitted, first, that the learned Judge was in error in failing to concentrate upon the alleged breach of the quiet possession term in s. 12(1)(b) of the 1979 Act. He says that that was important because the essence of that allegation of breach is that the breach did not occur and therefore no claim could be made in respect of it until after the six-month period had expired. By eliding the allegation of a breach of that term with the more general allegation of a breach of the term as to title, in Mr. Charkham's submission, the learned Judge diminished the importance of that factor.

33. He submitted, secondly, that the central feature of the present case is that the relevant claim arose after the six months' period had expired. It follows that if cl. 10 has the effect for which the respondents contend, then that claim effectively is still-born because no proceedings can be taken in respect of it.

*452 34. Mr. Charkham submitted, thirdly, that the learned Judge's summary of the evidence with regard to other forms of terms and conditions was not accurate. He said in particular that very many of them were governed by foreign laws. There was no evidence before the Judge as to what those foreign laws were. There was in any event considerable scope for argument as to what was the effect of the individual clauses in particular forms.

35. He submitted, fourthly, that the learned Judge

was wrong to consider the type of clause (that is to say, its general characteristic as a clause which seeks to prevent claims being brought after a specified period) when deciding whether sufficient notice of the existence of the clause was given to the other party, rather than the effect of the particular clause and specifically in the circumstances of this case. He emphasized, in relation to incorporation, that the clause in the present case has first, as he submits, the nature of a particularly onerous or unusual term, and secondly, that its effect is to abrogate the buyer's statutory rights given by s. 12 of the Sale of Goods Act.

36. These submissions therefore overlap the construction arguments, where Mr. Charkham submits that the clause has such unjust and unfair consequences in the circumstances of the present case (where the clause effectively prevents any claim being brought, because it could not be brought within the six-month period) as being sufficient ground for denying such a wide interpretation of the clause in this case.

37. These submissions of Mr. Charkham were developed in the skeleton argument and he has taken us through the different steps of his submission which he says lead to that conclusion. He submits, first, that the clause should properly be regarded as an exceptions clause, not merely a limitation clause, relying on the speech of Lord Sumner in Atlantic Shipping and Trading Co. Ltd. v. Louis Dreyfus & Co., (1922) 10 Ll.L.Rep. 707 at p. 708: [1922] 2 A.C. 250 at p. 261. He submitted that the judgment of Mr. Justice Rix in BHP Petroleum Ltd. v. British Steel Plc., [1999] 2 Lloyd's Rep. 583, if it is to a contrary effect, at pp. 589-590, is wrong, but he also referred us to the citations by Mr. Justice Rix from the House of Lords' judgments in Ailsa Craig Fishing Co. Ltd. v. Malvern Fishing Co. Ltd., [1983] 1 Lloyd's Rep. 183.

38. For my part, I am content to accept for present purposes that the proper approach to construing this clause is that which is adopted when an exceptions or exclusion clause is under consideration. That has been said to be a more stringent approach than when the clause merely seeks to limit the amount which may be recovered. I would add just this: it seems likely to me that the authorities are consistent with each other. The proper approach to interpretation would take account both of the kind of clause it is and the nature and extent of any rights which it purports to take away from the opposing party or to modify. However that may be, I am content to adopt the more stringent approach which has been referred to in relation to exceptions clauses.

[2000] 1 Lloyd's Rep. 446
1999 WL 1142725 (CA (Civ Div)), [2000] 1 Lloyd's Rep. 446, [2000] 1 All E.R. (Comm) 519
(Cite as: [2000] 1 Lloyd's Rep. 446)

Page 8

39. Mr. Charkham submits that the respondents' construction flouts business common sense and he adopts the familiar authorities to the effect that a construction which leads to an wholly unreasonable result is likely to be rejected by the Courts in a commercial contract such as this. Mr. Charkham's submission does not, in my view, take sufficient account of the factor which was referred to by the learned Judge; that is to say, the advantages for the seller and possibly for the buyer also if a line is drawn under a contract such as this after a certain, not unreasonably short, period has passed.

40. On the wording of the clause Mr. Charkham submitted, first, that the reference to "bringing a suit" in cl. 10 must imply that it was possible to bring a suit - which, of course, could not be done in relation to the alleged breach of the term to quiet possession until after the six-month period had expired. The words "all liability whatsoever shall cease" implied, he submitted, that there was a liability in existence prior to the cessation provided for at the end of the six-month period. Therefore, he said, on those narrow pedantic grounds, as well as the more general considerations, the clause should not be construed so as to defeat the present claims.

41. With regard to incorporation, Mr. Charkham referred us to the authorities which were also referred to by the Judge; in particular, to the fact that in the Interfoto case, different reasons for reaching the same conclusion were given by Lord Justice Dillon on the one hand and by Lord Justice Bingham on the other hand. The former concluded that the clause was not incorporated in the contract; the latter that, although incorporated, the clause should not be given effect to in the circumstances of the case. Where the two judgments are at one is in upholding the approach which is summarized in the passage from Chitty which I have already read.

42. With regard to the judgments in the AEG case, Mr. Charkham showed us that the majority held that, in applying the test of incorporation as set out in Chitty, it was appropriate to consider what may be called, for short, the construction and effect of the particular clause. That appears specifically at p. 273D in the judgment of Lord Justice Hirst. On *453 the other hand, Lord Justice Hobhouse, who dissented, held that the proper approach was to consider what kind of clause was in issue, and then to decide whether sufficient steps had been taken to bring the existence of that kind of clause to the notice of the other party and also to decide whether the particular clause was onerous or unusual by reference to the kind of clause that it was. It was wrong, he said, to apply that test to the specific terms of the clause in question. As he pointed out at p. 277B and following, that was a case where difficulties arose because the clauses, which were not of an unusual kind, were unreasonably drafted. He though that to concentrate upon the precise meaning of the particular clause in question meant that:
. . .one is completely distorting the contractual relationship between the parties and the ordinary mechanisms of making contracts. It will introduce uncertainty into the law of contract.

43. Mr. Charkham emphasized that diversity of view because in the present case the learned Judge referred to the judgment of Lord Justice Hobhouse with approval and it was that which had led him, Mr. Charkham submitted, to consider not so much the effect of this particular clause as simply the kind of clause which it was.

44. This summary has not done justice to Mr. Charkham's submissions, but I hope to have covered the main points which he has raised in support of his contentions, first, that the clause should bear a narrower construction than that for which the respondents contend; and, secondly, that insufficient was done by the respondents to bring this clause to the attention of the buyers in this particular case. As regards the third issue, with regard to the Unfair Contract Terms Act, Mr. Charkham repeated the submissions which he made to the Judge.

45. My conclusions are as follows. I will deal with the issues in reverse order. In my view the learned Judge was entirely right to reject the submissions with regard to the application of the Unfair Contract Terms Act. It seems to me as clear as could be that the reference in s. 26(3)(b) to a contract which is "made by the parties", and then refers to the places of business of the parties, is referring to the principals to the contract in question and not to the agents through whom the contract may have been made. The reference to s. 27(2)(b), where the statute draws a distinction between the parties on the one hand and others who may make the contract on his behalf on the other hand, seems to me to underline the fact that the reference to "parties" in s. 26(3)(b) is to the principals and not to their agents. It is unnecessary and superfluous to say that there are other reasons which would make Mr. Charkham's suggested construction, it seems to me, wholly impractical. The question whether the contract was within the Act or not would depend not upon the place of business of the parties to the contract, but to the possibly wholly coincidental location of the places of business of the agents through whom the contract was made. The place of business of the

parties would be likely to be referred to in a written contract; the place of business of the agents might well not be.

46. Insofar as Mr. Charkham suggested that there were general considerations as to the likely reasons for making the exemption which is found in s. 26, it seemed it me that those submissions fell at the first hurdle. The exemption is a limited one in respect of a particular kind of contract, namely contracts for the sale of goods only, and any such explanation would have to take account of that fact also, as Mr. Charkham's does not. Therefore I would uphold the Judge's order as regards issue No. 3.

47. I for my part would take issues 2 and 1 together. They are, of course, separate issues but they do overlap. The fact that they overlap is perhaps emphasized by the divergence of opinion in, first, the Interfoto case and secondly in AEG. In the former case, Interfoto, the two Lords Justices reached the same result but on the two different bases to which I have referred. It seems to me that the question of incorporation must always depend upon the meaning and effect of the clause in question. It may be that the type of clause is relevant. It may mean that the effect of the particular clause in the particular case is relevant. That, of course, was the division of opinion in the AEG case. But whichever it is, applying that test in the present case, the first stage is to ask what type of clause cl. 10 is. It is a clause which has the effect of a time bar clause which excludes liability after a certain period has passed. Mr. Charkham does not submit, as I understand it, that that type of clause could properly be regarded as either onerous or even unusual in a contract of this kind. But, assuming in his favour that it is necessary to apply the majority test in AEG, then the question arises whether this clause, which provides a six-month time limit, can justify either of those adjectives. Then the preliminary question, which was decided by the learned Judge as his first ground of decision, was that the authorities are of doubtful application in a case such as the present where there was an express acknowledgement in the contractual documents that the terms and conditions in question were incorporated.

48. Mr. Charkham submits that the Interfoto test, as he called it, has to be applied, even in a case *454 where the other party has signed an acknowledgement of the terms and conditions and their incorporation. It seems to me that Mr. Charkham could be right in what might be regarded as an extreme case, where a signature was obtained under pressure of time or other circumstances, and where it was possible to satisfy the Interfoto test; that is to say, that the clause was one which was particularly onerous or unusual for incorporation in the contract in question. I would prefer to put the matter more broadly and to say that the question is whether the defendants have discharged the duty which lies upon them of bringing the existence of the clause upon which they rely (and, if Mr. Charkham is right, of the effect of that particular clause) to the notice of the other party in the circumstances of the particular case.

49. As I have indicated, in some extreme circumstances, even a signature might not be enough. On the other hand, in the present case there was an express acknowledgement. It seems to me that, given the nature of this term and condition and its effect, as relied upon by the respondents, it cannot be said that the respondents failed in their duty to bring the existence of that term to the notice of the buyers, through, of course, their agents, to whom the term had been long available for their perusal. Mr. Charkham does not hesitate to submit that the clause in question should have had, as he puts it, the red hand approach. I would doubt very much whether that is practical in the context of a commercial contract such as this. In my view, the respondents did, in this particular case, where there was an express acknowledgement of the existence of the terms, certainly discharge their duty of bringing it sufficiently to the notice of the buyers for the clause to form part of the contract. That makes it unnecessary to make any explicit findings, as the learned Judge did, as to whether this clause was properly to be regarded as onerous or unusual; but, as I have already indicated, I have taken account of the effect of this clause in reaching the conclusion which I have already stated. It seems to me that there is in fact no evidence which supports the proposition that this clause is in any way extreme or totally unexpected to be found in a contract such as this.

50. Finally, therefore, I come to the question of construction. The most formidable argument, undoubtedly, is that the clause on the respondents' construction prevents the claimants from bringing a suit which could not be brought during the six-month period, simply because the breach occurred after that period ended. On the evidence that we have seen, this situation is certainly highly unusual and may even be unprecedented. It may be that Mr. Charkham regards that as an argument in his favour, but it seems to me that it is not. It does not lead to an inference that the parties would have given the clause a more limited meaning if they had contemplated this unusual situation arising some time in the future. It seems to me rather that the evidence shows that the risk of circumstances such as this arising was so small that one can accept that

[2000] 1 Lloyd's Rep. 446
1999 WL 1142725 (CA (Civ Div)), [2000] 1 Lloyd's Rep. 446, [2000] 1 All E.R. (Comm) 519
(Cite as: [2000] 1 Lloyd's Rep. 446)

Page 10

they were almost certainly not present to the minds of the parties, nor would they have been to the minds of persons placed as the parties were. It seems to me to follow from that that, if the matter had been raised, the risk would have been recognized as miniscule (to use a word which I suggested in argument). In those circumstances, even had the possibility been raised, the parties could well have agreed that the clause should remain as it was; in other words, that the buyers should accept that miniscule risk rather than seek to renegotiate the contract. In effect, the buyers would not be aware of any significant commercial disadvantage to themselves by agreeing at that stage to accept this small risk, if there was thought to be any real risk. That is perhaps another way of saying that I do not see any grounds in the present case for supposing that the parties intended that clause to have less than its clear effect. The effect is clear and, in my judgment, the learned Judge was right to find as he did on issues 1 and 2.

51. I would dismiss the appeal accordingly.

52.

Lord Justice HENRY:

I agree.

53.

Lord Justice WALLER:

I also agree.

(c) Lloyds of London Press Limited

END OF DOCUMENT